IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO.

WHITE CAP, L.P.,                                    Jury Trial Demanded

           Plaintiff,

   v.

HEYDEN ENTERPRISES, LLC, d/b/a
HEYDEN SUPPLY, BRIAN WELSH,
MIGUEL RIVAN, WAYNE ROSENBLUM,
and TIMOTHY KAVNEY,

           Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff White Cap, L.P. ("White Cap") files this Complaint for damages and injunctive relief against Defendants Heyden Enterprises, LLC, d/b/a Heyden Supply ("Heyden Supply"), Brian Welsh ("Welsh"), Miguel Rivan ("Rivan"), Wayne Rosenblum ("Rosenblum"), and Timothy Kavney ("Kavney"). Welsh, Rivan, Rosenblum, and Kavney are collectively referred to as the "Individual Defendants" and, with Heyden Supply, "Defendants."

## NATURE OF THE ACTION

1.     Heyden Supply has embarked on a multi-state campaign to attack White Cap's operations by stealing its personnel, customers, and confidential information. This brazen scheme is massive in scope and no less than a coordinated effort to specifically target White Cap's operations to steal its customers, employees, and confidential information and trade secrets.

2.     White Cap is primarily engaged in the highly competitive business of marketing, selling, and distributing industrial supply products throughout the United States. White Cap is the

nation's leading distributor of construction supplies and equipment and related services for professional contractors.

3.     Over the years, White Cap has successfully built its business through recruiting, training, and developing a highly skilled workforce to provide market-leading support to its customers. In the course of their employment with White Cap, managers and employees have access to and use of White Cap's trade secrets and confidential information. Such information would provide White Cap's competitors with an unfair competitive advantage if disclosed to or used by or on behalf of White Cap's competitors to compete against White Cap.

4.     White Cap built its business the right way: by developing the business organically or through acquisitions where it paid substantial consideration to purchase other building supply companies.

5.     Heyden Supply, led day-to-day by Founder Derek Heyden, recently entered the construction supply market in the Southeast with a broad range of products and services like those offered by White Cap. Prior to entering the industrial supply market, Heyden Supply's affiliated company, Keystone Concrete, was a customer of White Cap. Heyden Supply subsequently decided to cut White Cap out and become a distributor itself. As a result, White Cap and Heyden Supply are now direct competitors.

6.     While Heyden Supply is a direct competitor of White Cap, it has had limited success in organically growing its business and is apparently unwilling to buy other businesses in its market segment. So Heyden Supply decided to take it instead. As part of that scheme, Heyden Supply put into motion its unlawful plan to expedite Heyden Supply's growth by pirating White Cap managers and employees away from White Cap, tortiously interfering with White Cap's contractual rights, customers relationships, and employee relations, and inducing the Individual

2

Defendants to misappropriate trade secrets and confidential information and breach their fiduciary duties and duty of loyalty to White Cap, all to give Heyden Supply an unfair competitive advantage in the market.

7.     To try and conceal their wrongful conduct from White Cap, Heyden Supply developed a plan to unlawfully hire employees from White Cap in a wave of targeted departures, a raid that—since January 1, 2023—has snared dozens of employees from White Cap across the Southeast, and has required White Cap to take measures to retain many others whom Heyden Supply targeted. As part of this raiding scheme, Heyden Supply targeted employees at all levels of White Cap's operation, ranging from branch managers to outside and inside sales to dispatchers and truck drivers.

8.     At the same time, Defendants took steps to ensure their raiding plan would provide them with direct insight into White Cap's operations. To keep near real-time updates in White Cap's attempts to retain its customer base, Defendants left behind double agents employed at White Cap. These moles continued to work at White Cap while providing extensive updates about White Cap's activities to Defendants—thus allowing Defendants to precisely orchestrate their attacks on White Cap's operations, customers, employees, and confidential information and trade secrets.

9.     In addition to strategically staggering their hires, Heyden Supply conspired with the Individual Defendants to gain an unfair competitive advantage against White Cap by misappropriating White Cap's trade secrets and confidential information, tortiously interfering with contractual obligations and employee relationships, engaging in unfair and deceptive trade practices, breaching and aiding and abetting breaches of fiduciary duties and duties of loyalty, and colluding to harm White Cap, including upon information and belief, through false and misleading

statements about White Cap's operations and business made with the intent to injure White Cap.

10. The Individual Defendants worked from inside White Cap before they officially resigned to divert customers and sales to Heyden Supply, recruit other White Cap employees to leave and join Heyden Supply, and harm White Cap's business in the process. Additionally, Heyden Supply conspired with White Cap employees to illegally solicit customers from White Cap before the White Cap employes resigned, offering lower prices on products to these customers and offering to complete credit applications with Heyden Supply. At the same time, the Individual Defendants thoroughly stripped the Ft. Pierce branch of information necessary to complete work for its customers, including customer information, work orders, and detailed project plans for various customer projects.

11. Additionally, upon information and belief, Heyden Supply and numerous White Cap employees who resigned and joined Heyden Supply disparaged White Cap falsely telling customers and prospective customers that White Cap's operations were in disarray and that they could not provide adequate service. Upon information and belief, other personnel who later defected to White Cap also intentionally misquoted pricing to White Cap customers and delayed processing White Cap orders—all with the goal of creating discontent with White Cap's services.

12. Contemporaneously, Heyden Supply brazenly told White Cap employees who were subject to restrictive covenant agreements with White Cap that they would "hide them" at sister companies, falsely represent that they work in markets outside the geographic scope of their non-competition restrictions, misrepresent their actual job position, and/or engage them as independent contractors, if necessary, to mask violations of their restrictive covenant obligations.

13. Through these improper means, Defendants seek to intentionally harm White Cap and usurp White Cap's trade secrets, confidential information, and employee and business

4

relationships to develop and gain for themselves a competitive advantage at White Cap's expense. White Cap seeks injunctive relief to prevent this unfair competition and recover damages and its reasonable attorneys' fees and costs.

## PARTIES, JURISDICTION, AND VENUE

14.     White Cap is a Florida limited partnership with its principal place of business located in Norcross, Georgia. White Cap has a branch office located at 3101 Industrial Avenue 3, Ft. Pierce, Florida 34946. White Cap regularly transacts business in this judicial district.

15.     Defendant Heyden Supply is a Georgia limited liability company organized and existing under the laws of the State of Georgia with its principal place of business located in at 575 James Road, Alpharetta, Georgia, 30004. Heyden Supply is registered to do business in Florida, and its registered agent for service of process is Derek Heyden, located at 439 E. 8th Street, Jacksonville, FL 32206.

16.     Defendant Brian Welsh is an individual who resides at 5424 4th Manor, Vero Beach, FL 32968.

17.     Defendant Miguel Rivan is an individual who resides at 7237 Southeast Seagate Lane, Stuart, Florida 34997.

18.     Defendant Wayne Rosenblum is an individual who resides at 1722 Southwest Bismark Street, Port Saint Lucie, Florida 34953.

19.     Defendant Timothy Kavney is an individual who resides at 1025 Southwest Janar Avenue, Port Saint Lucie, Florida 34953.

20.     Does 1-10 are individuals whose identities are not presently known to White Cap, but include former White Cap employees and/or Heyden Supply employees who engaged in or facilitated the conduct alleged in this Complaint. White Cap will amend its Complaint to identify the Doe Defendants during the discovery process.

97128457v.8

21.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action includes a federal cause of action under the Defend Trade Secrets Act. This Court has supplemental subject matter jurisdiction over all claims for which it lacks original subject matter jurisdiction pursuant to 28 U.S.C. § 1367, because all other claims presented in this Complaint arise out of the same common nucleus of operative facts, namely, Heyden Supply's improper raiding of White Cap and misappropriation of its trade secrets.

22.     The Court has personal jurisdiction over Defendants because they are citizens of Florida or engaged in tortious activity in this State.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts or omissions giving rise to the claim occurred in the Southern District of Florida.

24.     Venue is proper in this division pursuant to IOP 2.01.01 and 2.02.00.

25.     This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees, and for injunctive relief.

26.     All conditions precedent to the institution or maintenance of this action have occurred or have been performed.

## FACTUAL BACKGROUND

## I.     OVERVIEW OF THE BUILDING SUPPLY INDUSTRY

### A.     White Cap's Business and Confidential Information and Trade Secrets.

27.     White Cap is primarily engaged in the highly competitive business of marketing, selling, and distributing industrial supply products throughout the United States. White Cap is the nation's leading distributor of construction supplies and equipment and related services for

professional contractors. Examples of construction supplies include, but are not limited to, concrete, rebar, lumber, nails, and similar building products and equipment.

28.     White Cap has distinguished itself from its competitors, like Heyden Supply, by providing superior service and value to its customers through, among other things, its pricing strategies, vendor relationships, sales and marketing methods, and investments in its sales representatives to ensure that they are some of the best in their respective areas.

29.     The sales cycle can be time-consuming and difficult. A sales representative must identify potential customers, whether on his own with his understanding of White Cap's offerings and his assigned market or with leads generated through White Cap's employees, customers, vendors, and other industry relationships. The sales representative must then get to know the potential customer, its business, and its needs and be able to demonstrate to the customer that doing business with White Cap will address the customer's issues and improve its day-today operations. For example, a sales representative may use his/her product and market knowledge to recommend alternative products or vendors that would better suit the customer's business. A sales representative could also rely on White Cap's pricing strategies or vendor relationships to be able to offer products to the customer at a lower price than what it is currently paying.

30.     Once a customer relationship is established, a sales representative must continue to cultivate that relationship. This involves developing plans to increase sales and profit margins from the customer, including working with internal White Cap resources and vendors to identify additional products that would benefit the customer, pricing that would be of value to the customer, and product cost that would deliver profitable sales for White Cap. It also requires the sales representative to provide exceptional customer service to ensure customer satisfaction and loyalty, including working with White Cap employees and vendors to resolve customer concerns.

97128457v.8

31.     White Cap's confidential, proprietary, and trade secret information and its customer and vendor relationships are the lifeblood of its business, and it spends substantial time, effort, and expense developing them.

32.     White Cap has developed extremely valuable and proprietary knowledge and trade secrets, including but not limited to, the following:

> (a)     detailed information regarding its industrial supply products and equipment and distribution methods;
>
> (b)     detailed information about current customers including customer contact information, preferences and purchasing authority, purchasing history, item usage and dedicated inventory reports;
>
> (c)     customer pricing, discounts, incentives, pricing strategies and net contribution, cost-to-serve and margin data;
>
> (d)     annual and monthly sales to customers, including profit and profit margins;
>
> (e)     Details to complete customer projects and placement plans; and
>
> (f)     information regarding prospective customers.

White Cap derives economic value from this information, which is not generally known or readily ascertainable by proper means by others who could gain economic value from its disclosure or use, and White Cap takes reasonable efforts to maintain the secrecy of this information.

33.     White Cap takes specific measures to preserve the confidentiality of its information, including but not limited to the following:

> (a)     White Cap generally requires its employees to sign non-disclosure agreements;
>
> (b)     White Cap require certain employees to sign non-compete, non-solicit and non-recruit agreements;
>
> (c)     White Cap stores much of its confidential information in a secured database and limits access to employees based on a need to know, which is part of White Cap's computer network;

8

(d)     White Cap restricts access to its computer systems, through passwords;

(e)     White Cap marks certain documents confidential;

(f)     White Cap requires employees to agree to numerous policies regarding confidential information, access and personal use; and

(g)     White Cap requires employees to return materials containing confidential information at the end of his or her employment with White Cap.

34.     White Cap limits access to its proprietary database and computer lists to certain employees on a need-to-know basis in order for them to perform their jobs. Several Individual Defendants, as well as other former White Cap employees working for Heyden Supply, had access to and used White Cap's confidential information and trade secrets through their positions of trust at White Cap.

35.     Through their roles at White Cap, White Cap entrusted Rivan, Rosenblum, and Kavney as agents of the company to maintain their relationships with customers, identify and execute sales opportunities, and act in the best interest of the company.

36.     If White Cap's confidential and trade secret information were to fall into the hands of a competitor, White Cap's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of White Cap's valuable accumulated knowledge.

**B.      Heyden Supply's Business and Status as a Competitor.**

37.     Defendant Heyden Supply is a Georgia-based building materials supply company that specializes in the marketing, distribution, and sale of construction supplies and equipment that are the same as or similar to the products and services White Cap offers.

38.     Heyden Supply offers its products and services to the same type customers as White Cap.

39.     Heyden Supply directly competes with White Cap.

40.     Upon information and belief, in or around the Spring of 2022, Heyden Supply

decided to speed up the growth of its business and market presence in the Southeast. Rather than hiring and training employees on its business, or acquiring another company to grow its business, Heyden Supply set out to build its business off of White Cap's employees, customers, and confidential information and trade secrets. Upon information and belief, Heyden Supply did so with the specific intent to harm White Cap.

41.     Heyden Supply's tortious activity has forced White Cap to file litigation against Heyden Supply in Georgia. Yet rather than stop its full-blown raiding of White Cap's workforce, Heyden Supply doubled down by expanding its raiding to South Florida.

   **C.     The Rebar Fabrication Business.**

42.     The Ft. Pierce branch for White Cap's primary business activity is rebar fabrication. Rebar is a steel rod that is inserted into concrete or a structure to enhance its tensile strength. Rebar fabrication is the process by which steel rods are cut and bent so they may be incorporated into a structure.

43.     The rebar sales and fabrication process generally works as described below. A customer contacts a supplier like White Cap or Heyden Supply and requests a quote. The supplier then "details" the request and creates a "takeoff," meaning a list of the components required to complete the request, and "placement plans," which provide information about how the rebar should be integrated into the structure. For single-family residences, detailing the project can be a straightforward process. For larger or more bespoke projects like multi-story housing or commercial buildings, detailing can take weeks to months. A supplier may detail in-house using employees or contract with an external party to prepare the takeoff and placement plans. The supplier generally continues to own the rights to the generated work product.

44.     When the takeoff and placement plans are prepared, the supplier will then provide a quote to fabricate the rebar based on the takeoff. If the customer purchases the rebar from the

97128457v.8

supplier, the supplier will normally not charge the customer for the cost associated with detailing. If the customer does not hire the supplier who prepared the detail and the project moves forward, the customer is normally invoiced for the cost of preparing the detail, which can range from $100 to well over $10,000 for more complex projects.

45.     Once the customer selects the supplier, the order then goes to fabrication. The supplier creates "tags" with specifications for the required rebar, which is then cut and/or bent from standard lengths of steel, and delivered to the customer along with a placement plan, which provides information about where the rebar should be installed.

46.     A rebar fabrication order often occurs over multiple phases based on the timeline for construction. So, while a customer will retain a supplier to provide rebar for an entire structure, the rebar will be "released" in batches, meaning that the customer will contact the supplier to authorize the rebar fabrication for that component of the structure. For example, in a one-story structure, the customer will release the rebar for the foundation. When that part of the project is completed, the customer will then contact the supplier to release the rebar for the slab. Once completed, the customer would then contact the supplier to release the rebar for the structural walls. By having the rebar fabricated in phases, it prevents clutter at the construction site and avoids confusion over which components should be installed, as well as allows contractors to pace their incurred expenses.

47.     Because rebar is a necessary component for a project, timely detail creation, quotes, and fabrication are critical to a supplier's reputation with customers and, consequently, the supplier's ability to attract and retain customers. Delays in the fabrication project can cascade into larger delays in project completion, because rebar insertion is an integral part of the building structure.

97128457v.8

**D.    Defendants Brian Welsh, Miguel Rivan, Wayne Rosenblum, and Timothy Kavney's Employment.**

48.    The Individual Defendants all came to be employed by White Cap through White Cap's merger with another company, Construction Materials. Through a series of corporate transactions, White Cap merged with Construction Materials, and the Individual Defendants all joined White Cap as of November 8, 2021, when the two companies were integrated.

49.    Defendant Welsh worked for White Cap as the Branch Manager of White Cap's Ft. Pierce branch. Welsh resigned from White Cap on May 27, 2022 and accepted a position with Heyden Supply.

50.    Defendant Rivan joined White Cap as an Account Manager on November 8, 2021. Prior to joining White Cap, Rivan had worked for Construction Materials since 2011. Rivan resigned from White Cap on July 31, 2023. During Rivan's employment with White Cap, he also detailed for White Cap. The resulting takeoffs and placement plans were created in the scope of his employment, and Rivan received additional compensation for his activity as a detailer. The products of his detailing activity constitute works for hire, and White Cap owns them.

51.    Defendant Rosenblum joined White Cap on November 8, 2021 as the Lead Inside Sales Representative. Prior to joining White Cap, Rosenblum had worked for Construction Materials since 2004. Rosenblum resigned from White Cap on July 28, 2023.

52.    Defendant Kavney joined White Cap on November 8, 2021 as the Account Manager. Prior to joining White Cap, Kavney had worked for Construction Materials since 2013. Kavney resigned from White Cap on July 31, 2023.

53.    During their employment, the Individual Defendants each gained extensive knowledge of White Cap's confidential information and trade secrets, including, but not limited to, product information, vendor and customer lists, pricing, special discounts, employee

12

97128457v.8

compensation, and White Cap's confidential marketing and distribution methods for its products and operations.

## II.    DEFENDANTS' PLAYBOOK TO MISAPPROPRIATE BUSINESS

### A.    Welsh and Rivan's History of Tortious Activity.

54.    Upon information and belief, Welsh and Rivan had a playbook to misappropriate business before moving to a new employer. As White Cap recently learned, over ***three separate companies***, Welsh and Rivan have violated their common-law obligations through pre-resignation activity that went well beyond mere preparations to compete but, instead, extended into a full-blown effort to undermine their then-present employer. Their playbook includes:

(a)    **Sabotaging Performance** - Engaging in activity to increase customer dissatisfaction with their employer before resigning by sabotaging business through acts such as intentionally misquoting orders, deliberately delaying or failing to submit orders for fabrication, and hiding fabrication tags that had been submitted so that the work would not be performed;

(b)    **Disparaging the Company** - Disparaging their employer to customers by telling customers that their employer was in disarray, that the company was poorly run and overcharging them, and other false and disparaging statements;

(c)    **Stealing Confidential Information and Trade Secrets -** Misappropriating customer contact information, pricing information, job information, and other confidential or proprietary materials;

(d)    **Soliciting Employees** - Soliciting employees to join the new employer while still employed with their employer; and

(e)    **Soliciting Customers -** Soliciting customers for their new employer while still employed by their employer.

55.    Welsh and Rivan previously worked at a company called Size Supplies. They first tested this playbook during a move to Hughes Supply. And it worked; Welsh and Rivan successfully converted numerous Size Supplies customers and employees through their tortious conduct.

56.     So they did it again. When Welsh and Rivan were ready to move on from Hughes Supply, they dusted off their playbook and apparently ran the same scheme focused on disparaging Hughes Supply, undermining their operations, soliciting its customers and employees, and misappropriating confidential information to compete against Hughes Supply while still on Hughes Supply's payroll.

**B.     Welsh and Rivan Run The Same Playbook at White Cap.**

57.     And now history repeats itself for a third time. Upon information and belief, beginning in or around the Spring of 2023, Welsh and Rivan began plotting the same unlawful activity they previously deployed with great success during their prior moves. And they found a more than willing partner in Heyden Supply.

58.     The Individual Defendants' unlawful activity went well beyond mere preparations to compete. Rather, the Individual Defendants, upon information and belief with Heyden Supply's full endorsement and support, initiated a systematic attack on White Cap's operations, customers, and employees, and confidential information and trade secrets.

**C.     Defendants' Assault on White Cap's Operations.**

59.     The Individual Defendants began by cultivating dissatisfaction against White Cap.

60.     In the Spring of 2023, White Cap personnel began to notice unusual problems with operations. Suddenly, White Cap received calls from aggravated customers complaining that they had not received a placed order. When White Cap personnel investigated the order status, the order had never been submitted to fabrication.

61.     Rivan took direct action to impair White Cap's operations and frustrate customers. For example, one customer sent orders for fabrication to Rivan several weeks before the requested completion date. Rather than do his job, Rivan intentionally sat on the orders and did not provide them to White Cap for fabrication until very shortly before the customer's requested delivery date

or the day of the requested delivery. Upon information and belief, he did so specifically to create justifications for these customers to move their work to Heyden Supply.

62.     Customers also complained that they had been quoted unusually high prices for projects. In some cases, White Cap itself could not determine why the customer had been quoted a price that was substantially higher than what White Cap's historical order history would indicate, or the quoted pricing was outside the range of pricing provided to Account Managers. Several of these quotes were provided by Rivan. Upon information and belief, Rivan intentionally quoted inaccurate pricing to increase dissatisfaction with White Cap's services and to make customers more pliable to future promises of better pricing from a different company.

63.     Upon information and belief, Heyden Supply and Welsh orchestrated, and/or endorsed supported, or encouraged this activity like a puppet master.

**D.     Defendants' Assault on White Cap's Customers.**

64.     After cultivating dissatisfaction against White Cap, the Individual Defendants then began contacting White Cap's customers in a campaign to secure commitments to leave White Cap and move to Heyden.

65.     The Individual Defendants' efforts were so brazen that several customers alerted White Cap that its own employees were trying to sabotage its operations.

66.     For example, on July 20, 2023 a Purchasing Agent for a customer spoke with Miguel Rivan and Rivan told the Purchasing Agent that he was leaving White Cap to join Heyden, that White Cap was in disarray and overcharging the customer, and that he could provide more favorable terms at Heyden Supply. The Purchasing Agent asked Rivan to provide a credit application to buy from Heyden Supply.

67.     The following morning, July 21, 2023 at 8:09 a.m., Welsh emailed the Purchasing Agent out of the blue and provided him with a credit application to set him up as a customer at

97128457v.8

Heyden Supply. The Purchasing Agent had not previously dealt with Welsh during Welsh's employment at Heyden Supply, and there is no conceivable way that Welsh would have known to contact the Purchasing Agent with a Heyden Supply credit application unless Rivan told him.

68.     Immediately thereafter, on July 21, 2023 at 8:22 a.m., Rivan texted *the Purchasing Agent* to confirm that he received the credit application sent by Welsh.

69.     After Rivan's resignation, on or about August 1, 2023, Rivan repeatedly called the Purchasing Agent in an effort to capitalize on his pre-departure breach of his duty of loyalty. When phone calls did not yield a response, Rivan texted the Purchasing Agent and expressed concern that he had not returned his calls.

70.     The above is just one example of Rivan's efforts to move business to Heyden Supply prior to his resignation  On or around July 25, 2023, Rivan contacted a different White Cap customer by calling its Purchasing Coordinator. Rivan told the Purchasing Coordinator that he was joining Heyden Supply and that he would be taking over this customer's business from the existing Heyden Supply contact, Doug Gross. Rivan then attempted to convince the Purchasing Coordinator to move more work from White Cap to Heyden Supply—all while he was still employed by White Cap.

71.     Moreover, additional customers have contacted White Cap about Rivan's improper solicitations. Specifically, several additional customers informed White Cap that before Rivan resigned from White Cap he solicited them, told them he was going to Heyden Supply and offered lower pricing to get the work on behalf of Heyden Supply.

72.     Rivan also capitalized on his pre-resignation activity to frustrate White Cap's customers. He contacted one customer after he resigned and disparaged White Cap by claiming that the company was responsible for their frustrations with order fabrication times when, in fact,

16

Rivan had intentionally delayed in sending the orders to White Cap to facilitate the customer's willingness to move its business to Heyden Supply.

73.     These interactions represent only the tip of the iceberg of the Individual Defendants' and Doe Defendants' improper efforts to breach their duty of loyalty and fiduciary duty or to aid and abet the violations of others. Numerous other White Cap customers have contacted White Cap and informed the company that **_current White Cap employees_** had previewed that they were leaving to join Heyden Supply and, in several instances, overtly advocated for those customers to move their business to Heyden Supply and disparaged White Cap as part of their pitch.

74.     Additionally, the Individual Defendants appear to have diverted work from White Cap during their employment. On August 1, 2023, White Cap received 27 invoices for detailing work, but the company did not have a record of many of the associated job in its system, nor could it find the details or project plans for these projects in the files left behind by the Individual Defendants. White Cap personnel subsequently confirmed that **_Heyden Supply_** ended up selling and delivering the rebar for some of these projects.

75.     Upon information and belief, this activity was orchestrated by Heyden Supply and Welsh and/or such activity occurred with Heyden Supply and Welsh's endorsement, support, or encouragement.

**E.     Assault on White Cap's Employees.**

76.     To further cripple White Cap's business, the Individual Defendants also openly solicited other employees to leave White Cap and join Heyden Supply.

77.     Multiple White Cap employees reported that other White Cap employees  solicited them during employment. For instance:

(a)     Simeus Stevenson reported to Brian Davis that White Cap employees had approached him multiple times to leave White Cap and join Heyden Supply.

17

(b)     Bernard Wright, the Lead Warehouse Associate, attempted to recruit multiple White Cap employees to leave White Cap and join Heyden Supply during his employment with White Cap.

(c)     Defendants also encouraged White Cap employees to lie about their employment status to delay White Cap's ability to secure replacement personnel. One employee, Dieuseul Eglaus, told White Cap that he was going on out leave for his mother's funeral in Haiti. In fact, Eglaus began working for Heyden Supply—a fact only confirmed by White Cap when he was spotted driving a Heyden Supply truck.

(d)     Another employee, Gomer Black, falsely represented to White Cap that he was retiring. Rather than retire, he began working for Heyden Supply.

(e)     Upon information and belief, Heyden Supply and Welsh also hired White Cap personnel to work weekends at Heyden Supply while still employed at White Cap.

78.     Upon information and belief, because of their unlawful conduct, Defendants have been able to successfully recruit to Heyden Supply ***nearly 25% of White Cap's Ft. Pierce employees***. Upon information and belief, Heyden Supply has hired the following White Cap employees:

(a)     Miguel Rivan

(b)     Justin Currier

(c)     Bernard Wright

(d)     Jose Sanchez

(e)     Fabian Dennis

18

97128457v.8

       (f)     John Walston

       (g)     Wayne Rosenblum

       (h)     Octavious Hawes

       (i)     Juan Santiago

       (j)     Gregg Moore

       (k)     Gomer Black

       (l)     Tim Kavney

       (m)     Dieuseul Eglaus

       (n)     Brian Welsh

79.    Heyden Supply, following the tactics it has deployed in other states, also hid employees in roles to avoid White Cap's identifying violations of restrictive covenants. Upon information and belief, Heyden Supply hired Justin Currier, the Warehouse Manager for White Cap, as a Warehouse Manager. However, because working as a Warehouse Manager would violate his non-compete agreement, Heyden Supply claims that it hired him as a Driver.

80.    Upon information and belief, the Individual Defendants and Doe Defendants, in furtherance of their conspiracy to steal White Cap's business, solicited White Cap employees while still employed at White Cap.

81.    Upon information and belief, this activity was orchestrated by Heyden Supply and Welsh and/or such activity occurred with Heyden Supply and Welsh's endorsement, support, or encouragement.

    **F.**    **Defendants' Extensive Misappropriation of Confidential Information and Trade Secrets.**

82.    The Individual Defendants, as part of their conspiracy, also extensively misappropriated White Cap's confidential information and trade secrets. Historically, the

Individual Defendants maintained copies of the rebar takeoffs and placements plans and other information related to jobs, only rarely providing such information to management personnel at White Cap, such as the Branch Manager and the District Fabrication Manager. Instead, the Individual Defendants kept only one paper copy or copies in their White Cap emails of information relating to White Cap's projects they were managing. In some cases, former White Cap employees even instructed a detailer to only send the resulting work product to them alone and not include anyone else from White Cap.

83.     Rosenblum, as the Lead Inside Sales employee, had primary responsibility to maintain and catalog this information. Rather than fulfill his duties to White Cap, Rosenblum, in concert with the other Individual Defendants, pilfered White Cap's confidential information and trade secrets to use at Heyden Supply.

84.     After Rosenblum's resignation on July 28, 2023, White Cap employees were unable to locate substantial quantities of pricing information and project details—even after an extremely thorough search of the branch office. Rosenblum historically kept this information in paper form in his office. Upon information and belief, Rosenblum stole this information to both impair White Cap's ability to retain this work and to secure its transfer to Heyden Supply.

85.     That was not all. White Cap also maintained a hard copy file with confidential customer information. Because of the sensitivity of the information, White Cap stored this file in a filing cabinet in Rosenblum's office.

86.     Jackman did not remove this file from the cabinet in the branch office.

87.     Upon information and belief, Rosenblum stole the customer payment information file to impair White Cap's operations and/or to use this information during his employment at Heyden Supply. Upon information and belief, Rosenblum stole this highly confidential

information as part of his conspiracy with Defendants to steal White Cap's business.

88.     While Defendants' theft has impaired White Cap's ability to quantify the amount of stolen information, White Cap believes that the information stolen by Defendants amounts to *several million dollars of business*.

89.     And Defendants are actively using what they stole to compete against White Cap. On Wednesday, August 9, 2023, White Cap discovered that rebar had been delivered to a customer by Heyden Supply *with a White Cap placement plan*:



90.     According to this tag, the job number associated with this rebar delivery is 23-060.

91.     Sitting next to this rebar was a White Cap placement plan:

97128457v.8



92.     This placement plan, which includes White Cap's logo and contact information, includes the order number associated with a White Cap detail.

93.     Upon information and belief, former White Cap sales representative Tim Kavney, took the takeoff and placement plans associated with this order and filled it from Heyden Supply, instead of White Cap, using the White Cap placement plan.

94.     White Cap also obtained several emails demonstrating that Defendants diverted work that was being performed by White Cap to Heyden Supply.

95.     Upon information and belief, Defendants engaged in a similar practice with other orders. White Cap has seen a significant reduction in its work volume in the two-week period following Rivan, Rosenblum, and other White Cap employees' departures. Upon information and belief, this slowdown occurred because one or more defendants, on behalf of Heyden Supply, began diverting active orders from White Cap to Heyden Supply even before their resignations.

96.     Moreover, White Cap has additional reasons to believe that Defendants are actively using White Cap's confidential information and trade secrets to undercut White Cap's proposals. White Cap has submitted several quotes for projects where Heyden Supply's proposed pricing is a mere one or two cents lower than White Cap's proposal. Upon information and belief, Heyden Supply's ability to slightly undercut White Cap's bid is occurring because Defendants are using misappropriated information to compete against White Cap.

97.     During his employment with White Cap, Rivan also detailed projects for White Cap, for which he received additional compensation. Rivan detailed these projects during his employment with White Cap. As a result, White Cap is the proper owner of these resulting takeoffs and placement plans.

98.     Upon information and belief, Rivan has, without authorization misappropriated the takeoffs and placement plans he prepared or received during his employment and is now using those files, which are White Cap's property, to compete against White Cap.

99.     Upon information and belief, Rivan, Rosenblum, and other former White Cap employees, with Heyden Supply's full endorsement and support, misappropriated information from White Cap to use against the company in their roles at Heyden Supply.

**G.     Heyden Supply Uses Moles to Target White Cap.**

100.     Despite their widespread raid on White Cap's employees, Defendants were also careful to leave behind moles at White Cap to gather intelligence about White Cap's attempts to staunch the bleeding.

101.     One of Heyden Supply's double agents was Matthew Maier. Maier routinely provided updates about developments at White Cap to Heyden Supply. On multiple occasions, White Cap personnel observed Maier walk outside to make a call. When outside, Maier would then provide someone with information about activity at White Cap, which, upon information and belief, Heyden Supply would then use to refine its attacks on White Cap.

102.     On August 1, 2023, Maier openly attempted to recruit a White Cap employee to join Heyden Supply.

103.     White Cap personnel also observed Maier repeatedly step outside to make phone calls. When approached by a member of White Cap's management team, Maier walked away or made other efforts to distance himself.

104.     As a result of this blatant breach of his duty of loyalty and fiduciary duty, White Cap terminated Maier's employment on August 1, 2023.

105.     These double agents appear to have provided information to Heyden Supply almost in real time.

106.     Indeed, Welsh and Heyden Supply did not make any real effort to hide their sources. To the contrary, they openly boasted to Heyden Supply personnel about their double agents. Wright bragged that Heyden Supply knows what happens as soon as it happens at White Cap, and

that White Cap employees, including Maier, kept Heyden Supply informed about White Cap's activity.

### H.      Welsh Violates His Contractual Obligations.

107.    Upon information and belief, Welsh began competing with White Cap and soliciting White Cap customers and employees during the one-year period following his separation from the company.

108.    During his employment with Construction Materials, Welsh executed an Employment Agreement ("Welsh Agreement"). A copy of the Welsh Agreement is attached as **Exhibit A** to this Complaint. White Cap has the right to enforce the Welsh Agreement because it merged with Construction Materials through a series of corporate transactions, which ultimately resulted in a 2021 merger of Construction Materials, Inc. into White Cap. White Cap therefore has the right to enforce the Welsh Agreement.

109.    In Paragraph 9.1 of the Welsh Agreement, Welsh agreed that, for a one-year period following his separation from White Cap, he would not:

(i)      Make known to any person, form or corporation, the names and addresses of any of the customers of the Company, either directly or indirectly;

(ii)     Call on, solicit, take away or attempt to call on, or attempt to take away any of the customers on whom [you] called or with whom [you] became acquainted during [your] employment with the Company, either for [yourself] or for any other person, firm or corporation.

(iii)    Engage directly or indirectly in the sale of construction materials of the type products sold by the Company or any other line of business carried on or contemplated by the Company, at the time of such termination, within the Designated Area.

(iv)     In the sales area described on the first page of this Agreement, solicit customers for, or otherwise aid or assist, anyone engaged in a business or businesses of the same type as that engaged in by the Company. This restriction on competition includes, but is not limited to, ... [you] accepting employment from a competitor. This Agreement specifically prohibits [you] from entering into

business for [yourself] in direct competition or in indirect competition with the Company in the Designated Area.

(v)     Engage in, establish, have full or partial ownership in, or participate in any way with a business that competes in any way with the business of the Company, in any of the sales territory and counties listed in this Agreement.

110.    The Welsh Agreement defines the "Designated Area" as the following counties: (i) Brevard, (ii) Broward, (iii) Indian River, (iv) Martin, (v) Orange, (vi) Osceola, (vii) Palm Beach, (viii) St. Lucie, (ix) Volusia.

111.    In addition to this reasonable restriction on Welsh's ability to unfairly compete against White Cap, Welsh also agreed that he would not, for a 12-month period following his separation, solicit White Cap's customers or employees.

112.    In Paragraph 9.2 of the Welsh Agreement, Welsh agreed that "all records of the accounts of customers, route books, product books, manuals, and documents relating in any manner whatsoever to the customers of the company or said corporation's products . . . shall be the exclusive property of the Company regardless of who actually purchased the documents, records, or books." Welsh also agreed to immediately return these documents and any proprietary information upon his separation from the Company.

113.    In Paragraph 9.3 of the Welsh Agreement, Welsh further agreed that he would not disclose any confidential information to anyone outside the Company's employment during or after his employment.

114.    In Paragraph 9.6 of the Welsh Agreement, Welsh agreed that, if he breached any portion of the Welsh Agreement, he would pay the company's reasonable attorneys' fees and costs incurred as a result of any breach.

115.    Upon information and belief, Heyden Supply claimed Welsh was working in a jurisdiction outside the scope of the Designated Area, though he began actually competing against

White Cap in the Designated Area and soliciting White Cap's customers and employees before the one-year term of these restrictive covenants expired, all in violation of the Welsh Agreement.

## III.   <u>HEYDEN SUPPLY'S ATTACK ON FT. PIERCE IS HOW IT STEALS BUSINESS</u>

116.   Heyden Supply has deployed the same unlawful and illegal tactics against White Cap across Florida and the Southeast. The acts described in this Complaint are not anomalous but, rather, represent Heyden Supply's battle plan in its assault against White Cap across the Southeast.

117.   Heyden Supply's unlawful tactics are consistent across geographic locations. In its other mass raiding efforts, Heyden Supply has:

    (a)   <u>**Used Strawmen**</u> – Having former White Cap employees share information and then call on each other's former customers as "strawmen" to hide their interference with these Agreements;

    (b)   <u>**Hid Non-Compete Violations**</u> – Falsely representing that former White Cap employees are based in other geographic areas than where they are actually working as a sham to hide the employees' violations of their non-compete Agreements with White Cap;

    (c)   <u>**Altered Email Accounts**</u> – Removing last names from Heyden email addresses to avoid detection of White Cap employees working for Heyden.

    (d)   <u>**Stole Confidential Information and Trade Secrets**</u> – Multiple White Cap employees who left to join Heyden Supply disclosed confidential information and/or trade secrets to Heyden Supply while still employed with White Cap and forwarded confidential information and/or trade secrets to their personal emails shortly before their separations.

    (e)   <u>**Coordinated Poaching**</u> – Heyden Supply coordinated the poaching of numerous key employees from White Cap to join Heyden and tortiously interfered with contracts and employee relationships.  Such employees include executives, management, outside sales representatives, inside sales professionals, dispatchers and truck drivers.

118.   As detailed above, Heyden Supply likewise deployed many of these tactics during its assault on White Cap's Ft. Pierce branch.

119.    The consistency in misconduct across these different raiding sprees is too consistent to be inadvertent. Instead, upon information and belief, Heyden Supply is orchestrating this tortious activity in order to maximize the amount of market share it can pilfer from White Cap.

120.    Defendants' pirating of White Cap's key managers and employees is intended to acquire the expertise and knowledge that White Cap has successfully built over many years through its trade secrets and other confidential information (*i.e.*, information not considered a trade secret) and, at the same time, gut White Cap's operational and sales divisions, thereby hampering White Cap's ability to compete against Heyden Supply in these markets.

121.    Using that confidential and trade secret information, Heyden Supply was then able to target and obstruct White Cap's relationships with key employees by recruiting them to join Heyden Supply and unfairly compete against White Cap. Upon information and belief, Defendants continue to use the confidential information and trade secrets that they misappropriated from White Cap to directly and unlawfully compete with White Cap on behalf of and as agents of Heyden Supply.

122.    White Cap attempted to stop Heyden Supply's attack on its business. It sent cease and desist letters to Heyden Supply and to employees who joined Heyden Supply—and even filed lawsuits to stop Heyden Supply's campaign against White Cap. But rather than cease its tortious activity and assault on White Cap, Heyden Supply instead doubled down by expanding its raid to Florida.

123.    White Cap finds itself facing a competitor that has directly attacked its relationship with customers, stolen its employees, and misappropriated its confidential information and trade secrets. Without immediate injunctive relief, White Cap will be irreparably harmed by Defendants' unfair competition.

## CLAIMS FOR RELIEF

### Count I - Violation of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq* Against Heyden Supply, Welsh, Rivan, Kavney, and Rosenblum, and Does 1-10

124.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

125.    The Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.* (the "FUTSA"), prohibits any person from misappropriating trade secrets by improper means, *e.g.,* theft, bribery, breach of contract or other duty, including inducement of such breach.

126.    White Cap's product information, vendor and customer lists, pricing, costs, profit margins, rebates, special discounts, marketing and distribution methods, takeoffs and placement plans, as well as other proprietary information to which Rosenblum, Rivan, Kavney, and the other former White Cap employees who now work for Heyden Supply had access constitute "trade secrets" as defined in the Act.

127.    White Cap undertakes substantial and reasonable efforts to maintain the secrecy of its trade secrets.

128.    Defendants Rivan, Rosenblum, Kavney, and Doe Defendants who now work for Heyden Supply had access to White Cap's trade secrets during their employment with White Cap and used such trade secrets in the service of and for the benefit of White Cap.

129.    Defendants Heyden Supply, Rivan, Welsh, Rosenblum, Kavney, and Doe Defendants have misappropriated White Cap's trade secrets by acquiring, using, and disclosing these trade secrets through their work for Heyden Supply.

130.    Defendants have also acquired White Cap trade secrets through improper means by stealing them in violation of their duty of loyalty and/or fiduciary duty, by aiding or abetting such breaches, by theft, misrepresentation, and/or their duty to maintain the secrecy of White Cap's

trade secrets.

131.    Upon information and belief, Heyden Supply and Welsh directed and encouraged Rivan, Rosenblum, Kavney, and Welsh to misappropriate White Cap's trade secrets to undermine White Cap's business and steal this work from White Cap, all for Heyden Supply's benefit.

132.    Defendants actually misappropriated and/or threatened to misappropriate White Cap's trade secrets without its consent and in violation of Florida law by (a) stealing physical copies of documents containing White Cap's trade secrets; and (b) using and/or disclosing White Cap's trade secrets for Heyden Supply's benefit in anticipation of and during their employment with Heyden Supply.

133.    Defendants' trade secret misappropriation was willful and malicious and was performed with the direct intended consequence of harming White Cap.

134.    There is no adequate remedy at law for the use or disclosure of the aforesaid information by Defendants because once the information is disclosed or used, it will inevitably influence the further course of development of Heyden Supply's competing business at White Cap's expense. Therefore, White Cap seeks injunctive relief against such use or disclosure, for the return of its trade secrets, and any other form of appropriate equitable relief.

135.    In addition, as a direct and proximate result of Defendants' acts, White Cap has sustained and/or will inevitably sustain substantial damage and will continue to sustain damages in the future in an amount to be proved at trial. White Cap seeks recovery of these actual and exemplary damages as a result.

136.    White Cap also seeks attorneys' fees and costs to the extent permitted by law.

137.    White Cap is also entitled to an accounting of all White Cap's trade secrets currently in Defendants' possession, custody, or control, and an accounting of all monies

97128457v.8

Defendants have earned or received by virtue of their improper and intentional misappropriation of White Cap's trade secrets, including disgorgement to the extent that Defendants were unjustly enriched by their misappropriation.

### Count II – Theft of Trade Secrets, Fla. Stat. §§ 812.035, 812.081
### Against Heyden Supply, Welsh, Rivan, Rosenblum, Kavney, and Does 1-10

138.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

139.    Fla. Stat. § 812.035(7) creates a private right of action to enjoin the improper use of a trade secret. Fla. Stat. § 812.081(1) provides that a court may issue an appropriate order or injunction to enjoin violations of Fla. Stat. § 8012.035, including by imposing reasonable restrictions upon the future activities or investments of any defendant, including, but not limited to, prohibiting any defendant from engaging in the same type of endeavor as the enterprise in which he or she was engaged in violation of the provisions of Fla. Stat. §§ 812.012-812.037 or 812.081.

140.    White Cap's product information, vendor and customer lists, pricing, costs, profit margins, rebates, special discounts, marketing and distribution methods, and takeoffs and placement plans, as well as other proprietary information to which Rosenblum, Rivan, and the other former White Cap employees who now work for Heyden Supply had access constitute "trade secrets" as defined in Fla. Stat. § 812.081(1)(f) because this information is secret, of value, for use in or by White Cap, and which provides an advantage or the opportunity to obtain an advantage in White Cap's market.

141.    White Cap undertakes substantial and reasonable efforts to maintain the secrecy of its trade secrets.

142.    Defendants Rivan, Rosenblum, Kavney, and the other former White Cap

employees who now work for Heyden Supply had access to White Cap's trade secrets during their employment with White Cap and used such trade secrets in the service of and for the benefit of White Cap in its business operations.

143.    Defendants Heyden Supply, Rivan, Welsh, Rosenblum, Kavney, and Doe Defendants have misappropriated White Cap's trade secrets by acquiring, using, and disclosing these trade secrets through their work for Heyden Supply. In doing so, Defendants misappropriation qualifies as "obtaining" or "using" White Cap's trade secrets under Fla. Stat. § 812.081(7).

144.    Defendants have also acquired White Cap trade secrets through improper means by stealing them in violation of their duty of loyalty and/or fiduciary duty, and by theft, misrepresentation, and their duty to maintain the secrecy of White Cap's trade secrets.

145.    Upon information and belief, Heyden Supply and Welsh directed and encouraged Rivan, Rosenblum, Kavney and Welsh to misappropriate White Cap's trade secrets to undermine White Cap's business and steal this work from White Cap, all for Heyden Supply's benefit.

146.    Defendants actually misappropriated and/or threatened to misappropriate White Cap's trade secrets without its consent and in violation of Florida law by (a) stealing physical copies of documents containing White Cap's trade secrets; and (b) using and/or disclosing White Cap's trade secrets for Heyden Supply's benefit in anticipation of and during their employment with Heyden Supply.

147.    Defendants' trade secret misappropriation was willful and malicious and was performed with the direct intended consequence of harming White Cap.

148.    There is no adequate remedy at law for the use or disclosure of the aforesaid information by Defendants because once the information is disclosed or used, it will inevitably

influence the further course of development of Heyden Supply's competing business at White Cap's expense. Therefore, White Cap seeks injunctive relief against such use or disclosure, for the return of its trade secrets, and any other form of appropriate equitable relief.

### Count III - Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836
### Against Heyden Supply, Welsh, Rivan, Rosenblum, and Kavney

149.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

150.    The Defend Trade Secrets Act ("DTSA"), which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

151.    White Cap's product information, vendor and customer lists, pricing, costs, profit margins, rebates, special discounts, marketing and distribution methods, takeoffs and placement plans, as well as other proprietary information to which Welsh, Rivan, Rosenblum, Kavney, and the other former White Cap employees who now work for Heyden Supply had access constitute "trade secrets" as defined in the DTSA.

152.    White Cap undertakes substantial and reasonable efforts to maintain the secrecy of its trade secrets. White Cap's trade secrets are not available to the general public and have economic value by virtue of the fact that they are not generally known. White Cap's trade secrets, including the information identified herein, are trade secrets under the DTSA, 18 U.S.C. § 1832, *et seq.*, because White Cap derives independent economic value from this information not being

generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

153.    White Cap's trade secrets are used in interstate commerce. White Cap does business in numerous states, and its trade secrets include information regarding its customers that operate in multiple states. White Cap's operations from its Ft. Pierce branch involve the delivery of products or goods outside the State of Florida, and White Cap works with customers and suppliers outside of Florida as part of its operations and business activities.

154.    Defendants Rivan, Rosenblum, Kavney, and the other former White Cap employees who now work for Heyden Supply had access to White Cap's trade secrets during their employment with White Cap and used such trade secrets in the service of and for the benefit of White Cap.

155.    Defendants misappropriated White Cap's trade secrets and have used and disclosed, or threaten to use and disclose, such trade secrets to Heyden Supply in order to compete unfairly against White Cap for the benefit of Defendants by their use of trade secrets misappropriated by Heyden Supply, Welsh, Rivan, Rosenblum, and Kavney.

156.    Defendants Heyden Supply, Welsh, Rivan, Rosenblum, and Kavney's use and disclosure of White Cap's trade secrets in their capacity as employees and for the benefit of Heyden Supply's competing business, and Defendants' use of White Cap's trade secrets, constitute both a misappropriation and a threatened misappropriation of White Cap's trade secrets.

157.    Defendants have also acquired White Cap trade secrets through improper means by stealing them in violation of their duty of loyalty and/or fiduciary duty, and by theft, misrepresentation, and their duty to maintain the secrecy of White Cap's trade secrets.

158.    Upon information and belief, Heyden Supply and Welsh directed and encouraged Rivan, Rosenblum, Kavney, and Welsh to misappropriate White Cap's trade secrets to undermine White Cap's business and steal this work from White Cap, all for Heyden Supply's benefit.

159.    Defendants actually misappropriated and/or threatened to misappropriate White Cap's trade secrets without its consent and in violation of the DTSA law by (a) stealing physical copies of documents containing White Cap's trade secrets; and (b) using and/or disclosing White Cap's trade secrets for Heyden Supply's benefit in anticipation of and during their employment with Heyden Supply.

160.    The information that Defendants have misappropriated relates to White Cap, which involve services that are utilized throughout interstate commerce.

161.    Defendants' trade secret misappropriation was willful and malicious and was performed with the direct intended consequence of harming White Cap.

162.    There is no adequate remedy at law for the use or disclosure of the aforesaid information by Defendants because once the information is disclosed or used, it will inevitably influence the further course of development of Heyden Supply's competing business at White Cap's expense. Therefore, White Cap seeks injunctive relief against such use or disclosure.

163.    In addition, as a direct and proximate result of Defendants' acts, White Cap has sustained and/or will inevitably sustain substantial damage and will continue to sustain damages in the future in an amount to be proved at trial. Plaintiff seeks recovery of these actual and exemplary damages as a result.

164.    White Cap is also entitled to an accounting of all White Cap's trade secrets currently in Defendants' possession, custody, or control, and an accounting of all monies Defendants have earned or received by virtue of their improper and intentional misappropriation

of White Cap's trade secrets, including the disgorgement to the extent that Defendants were unjustly enriched by their misappropriation.

### Count IV - Tortious Interference with White Cap's Business Relationships (Employees) Against Heyden Supply, Welsh, and Doe Defendants

165. White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

166. White Cap had existing business relationships with its employees.

167. Heyden Supply, Welsh, and Doe Defendants were aware of White Cap's employment relationships with White Cap employees.

168. Heyden Supply, Welsh, and Doe Defendants intentionally and unjustifiably interfered in White Cap's employment relationships through the conduct described in this Complaint, including by encouraging White Cap personnel to solicit other White Cap personnel while remaining employed by White Cap, by using White Cap personnel to obtain information about White Cap's employees, and, upon information and belief, by directing White Cap personnel to separate from the company in a manner calculated to minimize White Cap's ability to mitigate their departures.

169. Heyden Supply, Welsh, and Doe Defendants were external third parties with respect to the employment relationship between White Cap and its employees.

170. Heyden Supply, Welsh, and Doe Defendants, through their conduct, have interfered with White Cap's reasonable expectation of continued employment relationships with its employees. Acting improperly and without privilege, purposely and with malice and with the intent to injure White Cap, Heyden Supply, Welsh, and Doe Defendants have sought to induce White Cap employees not to continue employment relationships with White Cap, and White Cap is threatened with financial injury as a result.

36

171.     As a result of Heyden Supply, Welsh, and Doe Defendants' conduct, White Cap has suffered substantial harm and damages.

172.     There is no adequate remedy at law for the pirating of White Cap employees, because it will inevitably influence the further course of development of Heyden Supply's competing business at White Cap's expense. White Cap seeks injunctive relief to prevent this conduct from continuing.

173.     In the absence of immediate relief enjoining Heyden Supply, Welsh, and Doe Defendants from further tortiously interfering with White Cap's employee relations, White Cap will suffer irreparable harm for which there is no adequate remedy at law. White Cap also seeks punitive damages due to Heyden Supply, Welsh, and Doe Defendants' gross negligence and/or intentional misconduct.

**Count V - Tortious Interference with White Cap's Business Relations (Customers)**
**Against all Defendants**

174.     White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

175.     White Cap had existing business relationships with its customers. White Cap has a reasonable expectation that its relationships with customers would continue absent unjustified interference.

176.     Defendants were aware of White Cap's relationships with its customers. Indeed, Defendants specifically targeted White Cap's customers to disrupt the relationship between White Cap and its customers.

177.     Defendants intentionally and without justification interfered and continues to interfere, as well as engage in other unlawful actions described above, with White Cap's valid business relationships with its customers.

178.     Defendants' interference was unjustified and improper because their interference involved, among other activity, the improper use of White Cap information gleaned from White Cap employees, pre-departure solicitations, false and misleading statements about White Cap's operations, diversion of orders to Heyden Supply, and, for current employees, the use of their access to customers through their employment with White Cap to undermine (rather than advance) White Cap's relationships with its customers, and intentional efforts to impair White Cap's operations while still employed by White Cap.

179.     Defendants intended to harm White Cap by interfering with White Cap's customer relationships.

180.     Defendants unlawfully interfered and continue to interfere with White Cap's customer relationships, and their actions are without privilege or justification.

181.     As a result of Defendants' tortious interference with White Cap's customer relationships, White Cap has been injured and faces irreparable injury. White Cap is threatened with losing customers, its competitive advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are preliminary and permanently enjoined and restrained by order of this Court.

182.     In addition to a remedy at equity, as direct and proximate result of these actions, White Cap has suffered and continues to suffer harm and is entitled to recover damages against Defendants. Those damages include, by are not limited to, past and future lost profits, consequential damages, and margin erosion. White Cap also seeks punitive damages due to Defendants' gross negligence and/or intentional misconduct.

**Count VI - Breach of Fiduciary Duty**
**<u>Against Rivan, Rosenblum, and Kavney</u>**

97128457v.8

183.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

184.    Due to the nature of their duties and responsibilities for White Cap, and as employees of White Cap, Rivan, Rosenblum, and Doe Defendants each owed White Cap a fiduciary duty of loyalty during their employment with White Cap, because White Cap placed them in positions of trust and confidence, including by providing them with access to White Cap's confidential information and customer relationships. White Cap trusted Rivan, Rosenblum, and Kavney to act as agents of White Cap and to act in their employer's best interest. Their duty of loyalty and fiduciary duty included a duty to work solely for the benefit of White Cap and not for the benefit of a competitor.

185.    Rivan breached his fiduciary duty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) soliciting White Cap's customers; (c) disparaging White Cap; (d) failing to deliver White Cap's property to White Cap; (e) intentionally impairing White Cap's operations; (f) coordinating competitive activity against White Cap; (g) engaging in self-dealing or White Cap resources for projects unrelated to his work for White Cap; and (f) engaging in the misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

186.    Rosenblum breached his fiduciary duty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) failing to deliver White Cap's property to White Cap; (c) intentionally impairing White Cap's operations; (d) coordinating competitive activity against White Cap; and (e) engaging in the

39

misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

187.     Kavney breached his fiduciary duty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) soliciting White Cap's customers; (c) disparaging White Cap; (d) failing to deliver White Cap's property to White Cap; (e) coordinating competitive activity against White Cap; and (f) engaging in the misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

188.     As a result of Rivan, Rosenblum, and Kavney's breaches, White Cap has been injured and faces irreparable injury. White Cap is threatened with losing customers, its competitive advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are preliminary and permanently enjoined and restrained by order of this Court.

189.     As a result of Rivan, Rosenblum, and Kavney's breaches, White Cap has been damaged and is entitled to all damages, in an amount to be proven at trial, proximately caused by their breach of their fiduciary duty and duty of loyalty. Those damages include, by are not limited to, past and future lost profits, consequential damages, and margin erosion. White Cap also seeks punitive damages due to Heyden Supply, Rivan, Rosenblum, and Kavney's gross negligence and/or intentional misconduct.

### Count VII - Breach of Duty of Loyalty
### Against Rivan, Rosenblum, and Kavney

190.     White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

191.     Due to the nature of their duties and responsibilities for White Cap, and as employees of White Cap, Rivan, Rosenblum, and Kavney each owed White Cap a duty of loyalty during their employment with White Cap, because White Cap placed them in positions of trust and confidence, including by providing them with access to White Cap's confidential information and customer relationships. White Cap trusted Rivan, Rosenblum, and Kavney to act as agents of White Cap and to act in their employer's best interest. Their duty of loyalty and fiduciary duty included a duty to work solely for the benefit of White Cap and not for the benefit of a competitor.

192.     Rivan breached his duty of loyalty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) soliciting White Cap's customers; (c) disparaging White Cap; (d) failing to deliver White Cap's property to White Cap; (e) intentionally impairing White Cap's operations; (f) coordinating competitive activity against White Cap; (g) engaging in self-dealing or White Cap resources for projects unrelated to his work for White Cap; and (f) engaging in the misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

193.     Rosenblum breached his duty of loyalty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) failing to deliver White Cap's property to White Cap; (c) intentionally impairing White Cap's operations; (d) coordinating competitive activity against White Cap; and (e) engaging in the misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

97128457v.8

194.     Kavney breached his duty of loyalty through the actions described in this Complaint that occurred during his employment, including by (a) competing against White Cap; (b) soliciting White Cap's customers; (c) disparaging White Cap; (d) failing to deliver White Cap's property to White Cap; (e) coordinating competitive activity against White Cap; and (f) engaging in the misappropriation of White Cap's documents, files, and information (other than its files that constitute trade secrets), including those containing White Cap's confidential information, for his own benefit and to the detriment of White Cap.

195.     As a result of Rivan, Rosenblum, and Kavney's breaches, White Cap has been injured and faces irreparable injury. White Cap is threatened with losing customers, its competitive advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are preliminary and permanently enjoined and restrained by order of this Court.

196.     As a result of Rivan, Rosenblum, and Kavney's breaches, White Cap has been damaged and is entitled to all damages, in an amount to be proven at trial, proximately caused by their breach of their duty of loyalty. Those damages include, by are not limited to, past and future lost profits, consequential damages, and margin erosion. White Cap also seeks punitive damages due to Heyden Supply, Welsh, and Kavney's gross negligence and/or intentional misconduct.

### Count VIII – Aiding and Abetting a Breach of Fiduciary Duty
### Against all Defendants

197.     White Cap incorporates and realleges the allegations contained in paragraphs 1-123 and 184-89 as if fully set forth herein.

198.     White Cap's employees owe a fiduciary duty to White Cap during their employment with White Cap.

199.     Defendants were aware that White Cap's employees owe these duties to White Cap.

200.     As described in this Complaint, White Cap employees, including Rivan,

Rosenblum, and Kavney, breached their fiduciary duty of loyalty to White Cap through the actions described in this Complaint.

201.    Defendants were aware of the violations described in this Complaint because they facilitated their occurrence. Defendants provided substantial assistance to White Cap employees in their breaches of their fiduciary duties and duty of loyalty through the actions alleged in this Complaint, including by: (a) encouraging White Cap employees to disrupt the relationship between White Cap and its employees and customers; (b) encouraging White Cap employees to solicit White Cap employees and customers during their employment; (c) working with Maier to obtain information about White Cap's response to Heyden Supply's unlawful raiding and tortious interference; (d) coordinating the activities of White Cap employees to engage in conduct that interfered with or impaired White Cap's operations. Defendants provided substantial assistance and aid in committing White Cap employees' breaches of their fiduciary duty of loyalty.

202.    Defendants knowingly accepted the benefits resulting from the breaches of their fiduciary duty by White Cap employees, including Rivan, Rosenblum, and Kavney.

203.    As a result of these breaches, White Cap has been injured and faces irreparable injury. White Cap is threatened with losing customers, its competitive advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are preliminary and permanently enjoined and restrained by order of this Court.

204.    As a direct and proximate result of Defendants' aiding and abetting of fiduciary breaches, White Cap has been damaged in an amount to be proven at trial. Those damages include, by are not limited to, past and future lost profits, consequential damages, and margin erosion. White Cap also seeks punitive damages due to Defendants' gross negligence and/or intentional misconduct.

97128457v.8

### Count IX – Aiding and Abetting a Breach of Duty of Loyalty
### Against all Defendants

205.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 and 191-96 as if fully set forth herein.

206.    White Cap's employees owe a duty of loyalty to White Cap during their employment with White Cap.

207.    Defendants were aware that White Cap's employees owe these duties to White Cap.

208.    As described in this Complaint, White Cap employees, including Rivan, Rosenblum, and Kavney, breached their duty of loyalty to White Cap through the actions described in this Complaint.

209.    Defendants were aware of the violations described in this Complaint because they facilitated their occurrence. Defendants provided substantial assistance to White Cap employees in their breaches of their duty of loyalty through the actions alleged in this Complaint, including by: (a) encouraging White Cap employees to disrupt the relationship between White Cap and its employees and customers; (b) encouraging White Cap employees to solicit White Cap employees and customers during their employment; (c) working with Maier to obtain information about White Cap's response to Heyden Supply's unlawful raiding and tortious interference; (d) coordinating the activities of White Cap employees to engage in conduct that interfered with or impaired White Cap's operations. Defendants provided substantial assistance and aid in committing White Cap employees' breaches of their fiduciary duties and duties of loyalty.

210.    Defendants knowingly accepted the benefits resulting from the breaches of their duty of loyalty by White Cap employees, including Rivan, Rosenblum, and Kavney.

211.    As a result of Rivan, Rosenblum, and Kavney's breaches, White Cap has been injured and faces irreparable injury. White Cap is threatened with losing customers, its competitive

44

advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are preliminary and permanently enjoined and restrained by order of this Court.

212.    As a direct and proximate result of Defendants' aiding and abetting of breaches of the duty of loyalty, White Cap has been damaged in an amount to be proven at trial. Those damages include, by are not limited to, past and future lost profits, consequential damages, and margin erosion. White Cap also seeks punitive damages due to Defendants' gross negligence and/or intentional misconduct.

**Count X -Violation of Florida Deceptive and Unfair**
**Trade Practices Act, Fla. Stat. § 501,001**
**Against all Defendants**

213.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

214.    The Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.001 *et seq.*, provides that any aggrieved person may obtain injunctive relief to obtain a declaratory judgment that certain activity violates FDUPTA. Fla. Stat. § 501.211(1).

215.    In addition, FDUPTA authorizes a person who suffers actual damages as a result of any violation of FDUPTA to obtain actual damages caused by violating the statute. Fla. Stat. § 501.211(2).

216.    White Cap is a "person" within the meaning of Fla. Stat. § 501.211(1)-(2).

217.    Defendants engaged in deceptive acts and unfair trade practices through the acts described in this Complaint. Specifically, Defendants' deceptive acts and unfair trade practices include, but are not limited to: (a) disrupting White Cap's operations to increase customer dissatisfaction; (b) disparaging White Cap through objectively false statements, such as claiming that White Cap was overcharging its customers; (c) using current White Cap employees to obtain information about White Cap's activities; (d) improperly retaining information relating to White

Cap's operations, which disrupted its ability to complete customer orders and communicate with customers; (e) diverting orders from White Cap to Heyden Supply; (f) using White Cap's confidential information (other than trade secret information) to compete against White Cap; and (g) intentionally interfering with order placement and pricing. These activities are likely to mislead consumers and/or offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

218.    White Cap's customers are "consumers" within the meaning of Fla. Stat. § 501.203(7).

219.    Defendants' actions harmed consumers—White Cap's customers—by impairing White Cap's ability to process and complete orders and fulfill its obligations to its customers, resulting in project delays, incidental costs, and other harm to White Cap's customers.

220.    Defendants' actions have also harmed White Cap by jeopardizing White Cap's ability to identify and complete pending orders in a timely manner. Defendants' deceptive acts and unfair trade practices are a direct and proximate cause of damages to White Cap.

221.    This claim does not include any conduct that constitutes misappropriation of trade secrets.

222.    There is no adequate remedy at law for Defendants' violations of FDUPTA, and White Cap is entitled to an injunction and a declaratory judgment that Defendants' actions violate FDUPTA.

223.    White Cap is also entitled to recover its actual damages suffered as a direct and proximate result of Defendants' violations of FDUPTA, which include, but are not limited to, lost profits and employee time responding to Defendants' unlawful activity.

224.    White Cap also seeks to recover its attorneys' fees and costs as a prevailing party

under FDUPTA. *See* Fla. Stat. § 501.2105(1).

## Count XI – Breach of Contract
### Against Welsh

225.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

226.    Welsh and Construction Materials executed the Welsh Agreement.

227.    The Welsh Agreement is a valid and enforceable contract supported by adequate consideration. The restrictive covenants in the Welsh Agreement are reasonably tailored to protect White Cap's legitimate business interest.

228.    White Cap has standing to enforce the Welsh Agreement because it acquired Construction Materials and the Welsh Agreement through a merger.

229.    Upon information and belief, Welsh breached the Welsh Agreement by competing against White Cap in the Designated Areas and by soliciting White Cap's customers and employees.

230.    Welsh's violations of the Welsh Agreement have damaged White Cap, and White Cap is entitled to recover nominal damages, consequential damages, and its attorneys' fees and costs. White Cap is also entitled to an equitable extension of the restrictive covenants in the Welsh Agreement for the period in which Welsh was violating the Welsh Agreement.

## Count XII – Tortious Interference With a Contract
### Against Heyden Supply

231.    White Cap incorporates and realleges the allegations contained in paragraphs 1-123 and 226-30 as if fully set forth herein.

232.    Upon information and belief, Welsh breached the Welsh Agreement through the acts described in this Complaint.

233.    Heyden Supply had knowledge of the Welsh Agreement because White Cap sent a

97128457v.8

cease and desist letter to Welsh and Heyden Supply that included a copy of the Welsh Agreement.

234.     Upon information and belief, Heyden Supply intentionally interfered with the Welsh Agreement by creating a sham position in another jurisdiction, the purpose of which was to park Welsh in a territory outside of his restrictions that would give the appearance that he was not employed in a position that violated the Welsh Agreement.

235.     Upon information and belief, Heyden Supply's interference was intended to induce a breach or disruption of the Welsh Agreement and did in fact result in Welsh's breach of his contractual obligations.

236.     Upon information and belief, Heyden Supply did not have any legitimate justification for its interference with the Welsh Agreement.

237.     Upon information and belief, Heyden Supply's interference with the Welsh Agreement proximately caused damage to White Cap, including actual damages, lost profits, employee replacement costs, other actual damages, and attorneys' fees and costs. White Cap also seeks punitive damages as a result of Heyden Supply's intentional interference with the Welsh Agreement.

### Count XIII - Civil Conspiracy
### Against all Defendants

238.     White Cap incorporates and realleges the allegations contained in paragraphs 1-123 as if fully set forth herein.

239.     Defendants entered into an agreement to engage in unlawful activity or lawful activity by unlawful means. More than two parties agreed to participate in the conspiracy.

240.     Defendants engaged in numerous overt acts in furtherance of the conspiracy through the actions described in this Complaint, including, but not limited to, (a) soliciting White Cap employees using unlawful means; (b) soliciting White Cap customers using unlawful means;

97128457v.8

(c) impairing White Cap's operations using unlawful means; (d) diverting orders from White Cap to Heyden Supply; and (e) coordinating with each other to accomplish all of the foregoing activities.

241.   As a result of Defendants' conspiracy, White Cap has been damaged. Defendants are jointly and severally liable for the wrongful conduct committed in furtherance of the above-described conspiracy. White Cap is entitled to actual and compensatory damages and for Defendants to be jointly and severally liable for all damages caused by actions resulting from their conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, White Cap requests that this Court enter judgment in its favor and against Defendants by an entry of an Order that:

A.   Restrains all Defendants, and those acting in concert with them, preliminarily and permanently from using or disclosing any trade secrets and other confidential and/or proprietary information of White Cap, from soliciting White Cap's customers and employees, and from engaging in any deceptive act or unfair trade practice.

B.   Equitably extends the Welsh Agreement and enjoins him from violating it.

C.   Requires all Defendants, and those acting in concert with them, to return any and all trade secrets, confidential and/or proprietary information and property of White Cap to White Cap.

D.   Issues a declaratory judgment against Defendants finding that Defendants engaged in deceptive acts and unfair trade practices in violation of FDUPTA.

E.   Awards White Cap its damages incurred as a direct and proximate result of Defendants' unlawful conduct alleged in the Complaint, including its lost profits.

F.   Awards White Cap damages in the amount that Defendants were unjustly enriched

97128457v.8

through their unlawful conduct alleged in the Complaint.

G.      Award White Cap punitive and exemplary damages.

H.      Awards White Cap all costs and expenses incurred in connection with this action, including its reasonable attorneys' fees; and,

I.      Grants White Cap such other and further relief as this Court deems just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

White Cap hereby demands trial by jury of all issues so triable as of right by a jury.

DATED: August 16, 2023                Respectfully submitted,

By: */s/ Alex Meier*
_____

Robert C. Stevens*
bstevens@seyfarth.com
Alexander C. Meier, Fla. Bar No. 1011557
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Application for admission pro hac vice to be filed*

Attorneys for Plaintiff
WHITE CAP, L.P.

97128457v.8