## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-14248-CIV-MARTINEZ/MAYNARD

**WHITE CAP, L.P.,**

      **Plaintiff,**

**vs.**

**HEYDEN ENTERPRISES, LLC, d/b/a Heyden Supply, BRIAN WELSH, MIGUEL RIVAN, WAYNE ROSENBLUM, TIMOTHY KAVNEY, AND GOMER BLACK, JR.,**

      **Defendants.**

_____/

### <u>REPORT & RECOMMENDATION</u>

Plaintiff White Cap, L.P. ("White Cap") has filed a Motion for Preliminary Injunction against Defendants Heyden Enterprises, LLC ("Heyden"), Brian Welsh ("Welsh"), Miguel Rivan ("Rivan"), Wayne Rosenblum ("Rosenblum"), Timothy Kavney ("Kavney"), and Gomer Black, Jr. ("Black").  DE 148; DE 171.[1]  Welsh, Rivan, Rosenblum, Kavney, and Black will be collectively referred to as the "Individual Defendants" and, with Heyden, the "Defendants" or the "Heyden Defendants."  Plaintiff seeks a preliminary injunction to enjoin Defendants from soliciting or doing business with Plaintiff's customers that four of the Individual Defendants allegedly solicited while still employed by Plaintiff.  Plaintiff also seeks to enjoin Defendants from using any of Plaintiff's confidential information and trade secrets.  This matter has been referred to me for appropriate disposition.  DE 78.

---

[1] These two motions are one and the same. As part of the parties' preliminary injunction briefing, the parties were granted leave to file designated confidential information under seal.  As a result, there are instances of duplicative filings consisting of publicly available redacted briefing/exhibits and sealed unredacted versions of the same briefing/exhibits.

All Defendants have filed responses in opposition.  DE 166; DE 204; DE 165.  Plaintiff has replied.  DE 191; DE 202.  I held an evidentiary hearing on April 29, 2024, which was continued to May 17, 2024.  Following a careful review of the evidence, the briefing, the record, the hearing testimony, and the relevant law, I respectfully recommend that Plaintiff's Motion be **DENIED** for the following reasons.

## BACKGROUND

This case involves two competing construction supply companies with one, White Cap, claiming that its former employees unlawfully solicited customers and transferred its proprietary trade secret protected material to the other, Heyden.  White Cap sells and distributes construction supply products throughout the U.S. including, for example, concrete, rebar, lumber, nails, and similar building products and equipment.  DE 14 ¶ 28.  Heyden similarly sells and distributes construction supply products such as concrete tools and supplies to customers across the southeast U.S.  *Id.*  ¶¶ 38-40; DE 217-9, Heyden Dec. ¶¶ 3-4.  The five Individual Defendants previously worked for White Cap and later worked for Heyden.  DE 14 ¶¶ 16-20, 49-54.

On August 23, 2023, White Cap filed its operative Amended Complaint alleging that Defendants engaged in the improper diversion of White Cap's customers and misappropriation of White Cap's trade secrets.  *See generally* DE 14.  White Cap alleges claims for violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.* against Defendants (**Count I**); Theft of Trade Secrets, Fla. Stat. §§ 812.035, 812.081 against Defendants (**Count II**); Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 against Defendants (**Count III**); Tortious Interference with White Cap's Business Relationships (Employees) against Heyden and Welsh (**Count IV**); Tortious Interference with White Cap's Business Relations (Customers) against Defendants (**Count V**); Breach of Fiduciary Duty and Breach of Duty of

Loyalty against Rivan, Rosenblum, Kavney, and Black (**Counts VI and VII**); Aiding and Abetting

a Breach of Fiduciary Duty and Breach of Duty of Loyalty against Defendants (**Counts VIII and**

**IX**); Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.001, against

Defendants (**Count X**); Breach of Contract against Welsh (**Count XI**); Breach of Contract against

Black (**Count XII**); Tortious Interference With Contracts against Heyden (**Count XIII**); and Civil

Conspiracy against Defendants (**Count XIV**). *Id.* ¶¶ 143-271. Two days after filing its Amended

Complaint, White Cap filed a motion for temporary restraining order ("TRO").

On November 13, 2023, U.S. District Judge Martinez issued a TRO that enjoined

Defendants from:

(1)     using Plaintiff's confidential information and trade secrets;

(2)     soliciting customers that the Individual Defendants solicited for Heyden prior to their departures from Plaintiff and about which the Individual Defendants misappropriated Plaintiff's confidential information and trade secrets while employed with Plaintiff; and

(3)     breaching or interfering with the Black Agreement.

DE 57. The TRO was originally set to expire at 5:00 P.M. on November 23, 2023. *Id.* Judge

Martinez thereafter referred preliminary injunction proceedings to me. DE 78. Following prior

extensions, the TRO is currently in place until Judge Martinez issues a ruling on this report and

recommendation. DE 249.

Due to a series of unforeseen delays and stays of this case occasioned by counsel switches

for Heyden and four of the Individual Defendants, there were multiple continuances relating to

White Cap's request for a preliminary injunction. Finally, on April 29, 2024 and May 17, 2024,

an evidentiary hearing was held before me.

## EVIDENTIARY HEARING

At the April 29, 2024 hearing, White Cap opted not to call any witnesses and instead offered an overview of the available evidence of record, which in White Cap's view clearly demonstrates its entitlement to preliminary injunctive relief.  Defendant called witnesses Idalims Sagastume, Tim Mace, Rick Garrison, David Toth, Christopher Scammell, and Miguel Rivan to testify.  At a continuation of the hearing on May 17, 2024, Defendant briefly recalled Miguel Rivan and called additional witnesses Wayne Rosenblum, Gomer Black, and Brian Welsh to testify.  Each party introduced into evidence several documents, including email chains, sworn declarations, text messages, certifications, discovery responses, deposition excerpts, construction project documents, purchase orders, customer credit applications, and shop/technical drawings.[2]

---

[2] The Heyden Defendants object to the Court's consideration of certain evidence on grounds of hearsay, foundation, and relevance.  DE 244 (objecting to (1) exhibits attached to White Cap's TRO briefing, including declarations of Brian Davis, James Patchin, Beth Jackman, and Stacy Mower-Upperman, *see* DE 19-2 through DE 19-5, and an email exchange between White Cap's counsel and prior defense counsel regarding a proposed protective order, *see* DE 31-2; (2) a declaration of White Cap's counsel, Alex Meier, attached to White Cap's Preliminary Injunction Motion, *see* DE 171-22); and (3) a device imaging certification; initial disclosures; and an email exchange between counsel for the parties submitted as exhibits in connection with the preliminary injunction hearing, *see* DE 215-5 through DE 215-7).  White Cap responded in opposition to all objections.  DE 248.

At this stage, the court may "rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'"  *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995).  Here, I find generally that party submissions—such as discovery material and email exchanges— may appropriately be considered.

Regarding the challenged declarations, I exercise my discretion to rely primarily on in person hearing testimony and other reliable, non-hearsay evidence.  The core disputed issues of whether Defendants affirmatively acted to sabotage White Cap's business by soliciting customers and misappropriating information turn on questions of credibility, which are best evaluated with in person testimony rather than hearsay statements.  Affidavits submitted by White Cap as part of the TRO proceedings contain hearsay statements.  *See, e.g.,* DE 19-4 (Beth Jackman declaration reporting information about Defendants' alleged activities based in part on other unidentified White Cap employee and customer reports); DE 19-5 (Stacey Mower-Upperman declaration about problems purportedly caused by Defendants' activities based in part on customer reports and other hearsay information).  These affidavits went unchallenged and without the benefit of cross-examination when the TRO issued.  By contrast, the preliminary injunction hearing gave the parties a fair opportunity to present live testimony subject to cross-examination.  As I proceed through my analysis, I will rely only on that evidence which I deem relevant and sufficiently credible for purposes of evaluating the request for a preliminary injunction.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65(a) authorizes a district court to enter a preliminary injunction "where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  Fed. R. Civ. P. 65(a); *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003).  "The first two factors are 'the most critical.'"  *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Preliminary injunctions are "drastic" and "extraordinary" remedies, not to be issued unless the movant has "clearly established" the burden of persuasion on each element.  *Id.* at 1210.  They are the exception, not the rule.  *Id.*  "Failure to show any of the four factors is fatal" to the preliminary injunction inquiry.  *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion.").

**ANALYSIS**

For the Court to grant a preliminary injunction, White Cap must make a showing on each of the four injunction factors.  In this report, I focus my analysis on the two "most critical" factors of substantial likelihood of success on the merits and irreparable injury.  As explained below, White Cap has established a substantial likelihood of success on one of its claims, but it has not sufficiently shown irreparable harm to justify the extraordinary relief sought.  I will address each of these two factors in turn below.

5

## I.     SUBSTANTIAL LIKELIHOOD OF SUCCESS

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270-71 n.12 (11th Cir. 2020) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)).  A movant need only demonstrate a substantial likelihood of success on one of its claims to obtain a preliminary injunction.  *See Sapphire Consulting Servs. LLC v. Anderson*, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021) ("When a plaintiff asserts multiple claims as a basis for a preliminary injunction, the plaintiff 'need only establish a substantial likelihood of success on one claim.'" (citation omitted)); *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla. 2005) ("To obtain temporary injunctive relief, [a party] must show a substantial likelihood of success on at least one claim."), *aff'd*, 403 F.3d 1223 (11th Cir. 2005).

Here, White Cap has established a substantial likelihood of success on the merits of its breach of fiduciary claims, however not to the full extent alleged.  Substantial evidence shows that Defendants worked in tandem to improperly solicit White Cap's existing customers while Welsh worked for Heyden and Rivan, Kavney, Rosenblum and Black still worked for White Cap. Substantial evidence also shows that Defendants improperly used White Cap project-related work product to facilitate business for Heyden.  White Cap has not, however, sufficiently established a substantial likelihood of success on its claims of misappropriation of trade secrets or breach of contract against Black.

### A.     *Breach of Fiduciary Duty*

Under Florida law, the elements of a breach of fiduciary duty claim are: "(1) the existence of a fiduciary duty and (2) the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Knezevich v. Carter*, 805 F. App'x 717, 726 (11th Cir. 2020) (*citing Gracey*

*v. Eaker*, 837 So.2d 348, 353 (Fla. 2002)); *see also Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010) (to state a claim for breach of fiduciary duty, a plaintiff must show: the existence of a fiduciary duty; breach; and damages).  To state a claim for aiding and abetting a breach of a fiduciary duty, Plaintiff must show: (1) a fiduciary duty on the part of a primary wrongdoer; (2) a breach of that fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing.  *Fonseca v. Taverna Imps., Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017).

In the TRO, Judge Martinez succinctly stated the law governing the fiduciary duty an employee owes to an employer:

> "It is well-established under Florida law that an employee owes a fiduciary duty and a duty of loyalty to his or her employer." *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 U.S. Dist. Lexis 60122, at *15-16 (S.D. Fla. Apr. 6, 2018) (*quoting Bank of Am., N.A. v. Crawford*, No. 2:12-cv-691, 2013 U.S. Dist. LEXIS 20783, at *9 (M.D. Fla. Feb. 15, 2013)).

> "Absent agreement to the contrary, there is nothing to preclude an agent from competing with his principal *after the termination of their relationship*." *New World Fashions, Inc. v. Lieberman*, 429 So.2d 1276, 1277 (1st DCA 1983) (emphasis added).  An employee may not, however, "engage in disloyal acts in anticipation of his future competition such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment." *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. 5th DCA 1981); *JetSmarter Inc.*, 2018 U.S. Dist. Lexis 60122, at *16; *Furmanite Amm., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1149 (M.D. Fla. 2007).

DE 57 at 8.

Rivan, Rosenblum, Kavney, and Black's status as White Cap employees unquestionably generated a fiduciary duty owed to White Cap.  This legally imposed duty required these Defendants to act in White Cap's best interest while still employed by White Cap.  *See Kromka*, 706 F. Supp. 2d at 1288.

White Cap asserts that the Individual Defendants breached their fiduciary duty by

improperly soliciting customers for Heyden while some of them still worked for White Cap; misappropriating confidential information and trade secrets such as customer lists, pricing information, and construction details; delaying orders and quoting inaccurate prices to White Cap customers in order to sabotage White Cap; and soliciting other White Cap employees to leave White Cap and join Heyden.  DE 171 at 2-3.  At the TRO stage, White Cap substantiated these allegations through unrebutted affidavits.  At the preliminary injunction evidentiary hearing, however, Defendants offered testimony and exhibits to rebut some, but not all, of the factual claims made by White Cap.  Below I will summarize the evidence pertaining to the key categories of alleged breaches committed by Defendants.

i.     **Improper Pre-Departure Customer Solicitation**

White Cap presented substantial evidence at the hearing showing that in or around July 2023, Defendants collaborated to improperly solicit White Cap's existing customers while Rivan, Kavney, Rosenblum, and Black were still employed by White Cap.  Specifically, in July 2023, Welsh (as an agent of Heyden and a former White Cap employee) was directly involved in onboarding Rivan, Rosenblum, Kavney, and Black to work for Heyden while these four Defendants still worked for White Cap.  DE 171-1; DE 171-2; DE 171-3 (mid-July 2023 emails to and from Welsh identifying Rivan, Rosenblum, Kavney, and Black as "New Hires" for Heyden, setting up email addresses for these Defendants, and directing the "start" of the "onboarding process" for Kavney as a Heyden salesman).  During this same timeframe, evidence shows that Rivan, Rosenblum, Kavney, and Black covertly worked with Welsh to solicit and transition White Cap clients to Heyden—efforts that proved successful when several of White Cap's clients filled out new customer credit applications to do business with Heyden.  *See* DE 171-4 (consolidated summary of customer credit applications); *see also* White Cap Ex. E at 171-72 (email from Kavney

to Welsh on July 20, 2023 (when Kavney still worked for White Cap) with subject line "Credit apps" and listing 7 customers "that are open" and asking if 11 other customers "are open yet").

Ultimately, according to testimony by Welsh and others, some of those clients transitioned to Heyden for their construction supply needs. Several examples of this improper customer solicitation were presented at the evidentiary hearing. For his part, Welsh admitted at the hearing that Heyden now does business with all but one of the customers listed on Kavney's "Credit apps" email of July 20, 2023. Tr. II[3] at 200-01; White Cap Ex. E at 171-72. Moreover, at Kavney's request, Welsh admittedly sent an email to a representative of American Foundation, Corp.—who was a White Cap customer at the time—with an attached Heyden credit application. The ensuing Heyden application, dated July 17, 2023, listed "Tim"—referring to Timothy Kavney—as the designated "Sales Rep" even though Kavney still worked for White Cap at the time. DE 171-4 at 27-29. A similar process evidently took place with other White Cap customers. *See, e.g., id.* at 34-36 (Heyden application, dated July 21, 2023, signed by White Cap's then-customer R.J. Sullivan Corp. and listing "Gomer Black" as the "Sales Rep"); 48-51 (Heyden application, dated July 24, 2023, signed by White Cap's then-customer Constructure, Inc. and listing "Tim" as the "Sales Rep").

At the hearing, Black candidly admitted to calling some of his White Cap customers before leaving White Cap and telling them "how they could get in touch with Heyden if I was to wind up there." Tr. II at 95. Black also identified different customers that he "tried to transition over to Heyden"—including Eau Gallie, Mitchell Hancocks, David Mann Construction, Philip Johnson

---

[3] The preliminary injunction hearing spanning two days is memorialized in two separate transcripts—one transcript per day. In this report, citations to "Tr. I" refers to the transcript from the proceedings held on April 29, 2024, whereas "Tr. II" refers to the transcript from the proceedings held on May 17, 2024.

Inc., Hamilton Masonry, Trendsetter Construction, and JTC Concrete.  *Id.* at 99,101-06.[4]  Black conceded to "probably" asking Welsh to send Heyden credit applications to these customers.  *Id.* at 109-110.

In all, the evidence establishes White Cap's substantial likelihood of success on its claims that, while Rivan, Kavney, Rosenblum, and Black worked for White Cap, the individual Defendants collaboratively engaged in the disloyal act of soliciting White Cap customers "in anticipation of [] future competition."  *See Fish*, 401 So. 2d at 845; *JetSmarter Inc.*, 2018 U.S. Dist. Lexis 60122, at *16; *Furmanite*, 506 F. Supp. 2d at 1149.

**ii.    Improper Use of White Cap Documents**

Substantial evidence also shows that Defendants used White Cap work product (specifically White Cap customer construction project documentation) acquired while some of them still worked for White Cap to facilitate business for Heyden.  One clear example of this involved Black.  According to Black's testimony, after working as an outside salesperson for White Cap for two years, he announced his same-day retirement from White Cap effective July 31, 2023.  Tr. II at 67, 74, 92.  At the same time, however, Black "tried to play both sides of the fence" by also starting to onboard with Heyden.  *Id.* at 73, 90-91.  Ultimately, Black ended up not retiring from White Cap and instead worked for Heyden as an outside salesperson for three weeks, from August 1-24, 2023.  *Id.* at 66; Black Ex. 2 (Separation Notice from Heyden to Black dated August 25, 2023).  An email of record shows that during working hours on Friday, July 28, 2023, while Black still worked for White Cap, Black sent an email from his White Cap work email address to his personal email address with attached drawings and images pertaining to a "Lakeside

---

[4] Notably, Black listed some but not all of these customers in his interrogatory responses.  *See* DE 171-18 at 33 (Black's Amended Answers to First Set of Interrogatories).  When asked about this disconnect at the hearing, Black repeatedly said he really didn't know why certain customers were not listed in his responses.  Tr. II at 112-13.

Village – Kitchen Addition" project.  DE 171-20 at 106-16 (4:36PM email on July 28, 2023 forwarding attached documents with the subject line "Fw: 23WCAP05 – VI at LAKESIDE VILLAGE – KITCHEN ADDITION.").  Then, the following Friday, August 4, 2023, following Black's "retirement" from White Cap and as a new Heyden employee, Black reforwarded this same email with attachments from his personal email address to his Heyden Supply work email account.  *Id.* at 106 (8:01PM email on August 4, 2023 forwarding attached documents with the subject line "Fwd: Fw: 23WCAP05 – VI at LAKESIDE VILLAGE – KITCHEN ADDITION.").[5] Notably, the attachments included detailed project drawings bearing the White Cap name and logo. *Id.* at 109, 114-16.  At the hearing, Black admitted to forwarding himself these emails with the attached drawings, which were described as "placement plans and bar lists unique to the Lakeside Village kitchen addition project." Tr. II at 83-84; Black Ex. 12.  Black further admitted to selling rebar to the builder for this Lakeside project while employed by Heyden.  Tr. II at 84.  Welsh consistently testified that Heyden completed this Lakeside project.  *Id.* at 194.

Black further admitted to forwarding himself similar emails on Monday, July 31, 2023 at 6:24 A.M. (Black's last working day with White Cap) with attached placement plans and shop drawings that were uniquely related to a different project called Lemon Grass Asian Kitchen.  Tr. II at 81-82, 116-17; Black Ex. 3.  Black sent these "unique drawings" and "White Cap details" from his White Cap email to his personal email with knowledge that he could "possibly" use them at a later time.  Tr. II at 117.  Black then "double deleted" the email from just his White Cap email account because he didn't "think [he] needed it anymore."  *Id.* at 118-19.

Similar to Black, there is evidence that Kavney also moved White Cap customer project

---

[5] This email squarely contradicts Black's sworn interrogatory response admitting to the use of his White Cap email address to send the Lemongrass Asian Kitchen job information to his personal email address but stating that he "did not send this information to Heyden or use this information during his short tenure at Heyden."  DE 171-18 at 36.

documents to Heyden while he was still employed by White Cap.  For instance, on July 25, 2024, Kavney forwarded an email from his personal email address to Welsh's work email address at Heyden with attached "Architectural Plans" involving "Lot 18 Eisner" for customer AJ Bella. White Cap Ex. E, DE 171-5 at 32-85.  At the hearing, Welsh admitted that at the time this email was sent, Kavney still worked for White Cap and AJ Bella was a White Cap customer at the time. Tr. II at 194-95.  Welsh confirmed that Heyden got this project from Kavney and did the work for AJ Bella.  *Id.* at 195-96.  Welsh further confirmed at the hearing that while Kavney worked for White Cap, Kavney continued "to funnel" more AJ Bella projects to Heyden, including by sending emails directly to Welsh so that drawings would be made for Heyden to complete the projects.  *Id.* at 198-200.

The above evidence sufficiently establishes White Cap's substantial likelihood of success on its claims that certain Defendants engaged in the disloyal act of misappropriating White Cap work product to facilitate business for Heyden.

### iii.  Other Alleged Breaches

While White Cap has sufficiently established its claims of improper customer solicitation and unauthorized taking of White Cap project information, White Cap has failed to establish its allegations that Rosenblum, Kavney, and Rivan intentionally sabotaged White Cap before leaving White Cap's employ.  To establish these allegations, White Cap relies on affidavits stating that (1) shortly after Rosenblum resigned, confidential pricing information went missing, and since late July, Heyden was able to repeatedly undercut White Cap's pricing by mere pennies per pound of rebar; (2) that Kavney and Rivan failed to submit and delayed orders preventing Plaintiff from timely fulfilling its obligations, and (3) that Kavney and Rivan quoted inaccurate pricing to customers in order to sabotage White Cap.  DE 57 at 9; DE 19-4 at ¶ 14 (White Cap Branch

Manager Beth Jackman declaring that Rosenblum kept confidential pricing information in his office, White Cap was unable to locate the files after Rosenblum's resignation, and "Rosenblum and/or other employees who left White Cap and joined Heyden Supply took these files to use them to compete against White Cap."); DE 19-5 at ¶¶ 10-11, 13 (White Cap Account Manager Stacey Mower-Upperman declaring that a search of Rosenblum's office after he resigned revealed missing highly confidential customer information, that Heyden has "repeatedly undercut White Cap's pricing by pennies per pound of rebar" since late July 2023, and that Kavney and Rivan quoted inaccurate pricing to customers). White Cap did not call Ms. Jackman or Ms. Mower-Upperman to testify at the evidentiary hearing, and their declarations were not cross-examined.

Rosenblum took the stand to rebut these allegations.  Although acknowledging that he had access to customer vendor lists, pricing, and other materials, Rosenblum flatly denied taking any financial documents, customer lists, placement orders, or details with him to Heyden.  Tr. I at 25, 30-31.  He testified that the only information he destroyed before leaving White Cap was the folder system he used to organize his emails and customer credit card numbers he had written down to facilitate over the phone transactions because he felt it was his duty not to leave those numbers available for anyone to get.  *Id.* at 33-35, 43.  As for Ms. Jackman and Ms. Mower-Upperman, Rosenblum testified they never inspected his office to know what type of documents he kept there and were not watching when he took belongings from his office.  *Id.* at 24-25.  White Cap's evidence that Rosenblum deleted or misappropriated customer lists, pricing information, or other materials to compete against White Cap is thin.

White Cap also did not substantially support its contention that certain Defendants intentionally misquoted prices to customers or delayed orders to prevent White Cap from timely fulfilling its obligations.  In contrast, the Defendants who testified indicated that problems at White

Cap were due to poor management by White Cap's branch managers and dispatchers, not any actions by Defendants. Rosenblum testified that there were several issues at White Cap before he left, including delivery problems, orders being filled wrong, and customers calling because they did not receive the right merchandise, or a purchase was not timely delivered. Tr. II at 19. Rosenblum said customers would call 2 or 3 times per day complaining. *Id.* at 20. He brought these issues up with White Cap managers, and finally left White Cap due to the stress of customer calls and aggravation from not being able to do his job properly. *Id.* at 21.

Rivan similarly testified that delays and problems were due to White Cap's poor management, and he never intentionally delayed orders or quoted inaccurately high prices to White Cap customers. *Id.* at 45, 48-49, 59-60, 61. Regarding pricing, both Rivan and Rosenblum testified that they needed management approval at White Cap to set prices above a certain amount, and they never quoted a customer a higher price than the set amount. Tr. I at 174-76; Tr. II at 25-26. White Cap did not present any persuasive evidence to challenge Rosenblum and Rivan's testimony in this regard. White Cap also presented no evidence to substantially support its assertion that the Individual Defendants worked together to lure other White Cap employees to Heyden Supply.

Thus, having held an evidentiary hearing and based on a more expansive record, I find that only some of White Cap's alleged breaches of fiduciary duty are adequately supported resulting in a significantly narrowed landscape of accusations for which White Cap has shown a substantial likelihood of success. Specifically, White Cap established a substantial likelihood of success on the merits of its claim that Rivan, Kavney, Rosenblum and Black breached their fiduciary duty and duty of loyalty by improperly soliciting White Cap customers to do business with Heyden while still working for White Cap and by using White Cap project-related work product to facilitate

business for Heyden.  I also find that Welsh, working as an agent of Heyden, knowingly and actively aided and abetted these breaches.  I do not find that White Cap's other breach of fiduciary duty accusations are adequately supported.

### B.    Trade Secret Misappropriation

White Cap has not established a substantial likelihood of succeeding on its trade secret misappropriation claims.  To state a claim under either the DTSA or FUTSA,[6] a plaintiff must establish "(1) that the plaintiff possessed a 'trade secret,' (2) that the plaintiff 'took reasonable measures' to protect the trade secret, and (3) that the defendant used or disclosed the trade secret despite a duty to maintain secrecy."  *Freedom Mortg. Corp. v. Strong Home Mortg., LLC*, 2020 WL 8642053, at *3 (S.D. Fla. Dec. 15, 2020) (citations omitted).  A trade secret is information that derives its "economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy."  *Id.* (quoting *All Leisure Holidays Ltd. v. Novello*, 2012 WL 5932364, at *4 (S.D. Fla. Nov. 27, 2012)).  As explained in the TRO:

> Information such as customer lists and related information including customer lead information, sales data, and customer financial information, *Freedom Mortg. Corp.* [2020 WL 8642053, at *8-9], pricing data, and project specific information, *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 849-50 (11th Cir. 2016), are recognized as protected trade secrets under Florida law.

DE 57 at 10.

Citing declarations submitted by White Cap in support of its request for TRO, Judge Martinez found that White Cap "sufficiently identified information that qualifies as trade secrets, including compilations of customer information, details for projects, such as takeoffs and placement plans, customers lists, and customer pricing and project information."  *Id.*  Further, Judge Martinez found that White Cap "takes reasonable measures to protect this information by

---

[6] DTSA and FUTSA can be analyzed together.  *M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353-54 (S.D. Fla. 2016).

generally requiring employees to sign non-disclosure agreements or other restrictive covenant agreements, providing training on confidentiality, storing sensitive information in secure locations, limiting the distribution of its highly valuable information, and marking certain documents confidential." *Id.* (citing White Cap Chief Sales Officer Page Naftel's declaration that White Cap takes these measures to protect its confidential information).

Once again, the more expansive record from the hearing supports some but not all of White Cap's contentions. As discussed above, White Cap demonstrated that Individual Defendants took project-specific information, such as details, take-offs, and placement plans, obtained by and belonging to White Cap to facilitate business for Heyden. But White Cap has not established that Individual Defendants took proprietary compilations of customer information, customers lists, or pricing information. For such information, White Cap offered only declarations containing hearsay and speculation, and did not call the declarants to the stand to testify or be subject to cross-examination. Defendants have come forward with evidence to rebut these particular claims.

Although proprietary customer lists and pricing information can certainly warrant trade secret protection,[7] White Cap failed at the preliminary injunction hearing to offer reliable evidence showing that Individual Defendants took and/or misused proprietary customer information, lists, and pricing. White Cap did not point to any customer or pricing specific documents at issue or explain how such information was internally maintained and protected in White Cap's systems (via passwords protection or otherwise). Rosenblum flatly denied taking customer lists, data, or pricing with him to Heyden Supply. Tr. II at 25, 30-31. Rivan also denied taking pricing information, pricing sheets, or pricing numbers to Heyden, and said he never priced rebar or any supplies at Heyden using any kind of pricing or financial knowledge that he gained at White Cap.

---

[7] See TRO at 10 (citing cases).

Tr. I at 176.  White Cap has not shown that Individual Defendants took compilations of customer data contained in files, spreadsheets, logs, or databases.  Instead, it appears that Defendants solicited customers they already knew and had professional relationships with, without resorting to lists or databases containing trade secret or proprietary information. *See, e.g.*, Tr. I at 125-26 (AJ Bella Contractor's corporate representative testimony confirming that AJ Bella worked with Kavney before Kavney worked at White Cap and that AJ Bella is "absolutely … 100%" loyal to Kavney instead of the company he works with); Tr. I at 133-34 (Brevard Grouting Service's corporate representative testimony that Welsh has been the "primary source of contact for rebar purchases for over a decade" and that Brevard Grouting is "absolutely" loyal to Welsh and not the company he works for); Tr. I at 138-40 (MGM Shell Contractors' corporate representative testimony that he has known Kavney for 14 years during Kavney's time with four different companies and that his company will follow Kavney regardless of the company he works for); *American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407 (1998) (recognizing that former Red  Cross employees have professional relationships with individual Red Cross donors, relationships which these workers may now rely upon without infringing any of Red Cross' rights) (citing *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288, 290 (Fla. 2d DCA 1989).  There is also no evidence that the identities of White Cap's customers were kept sufficiently confidential for them to qualify as trade secrets.  Ultimately, I find that White Cap has not met its burden to establish a substantial likelihood of success with respect to misappropriation of proprietary customer lists, data, and pricing information.

That leaves the question of whether Defendants' use of White Cap work product, including construction project details, take offs, and placement plans, constitutes trade secrets violations.  As discussed above, substantial evidence shows that Defendants used White Cap details, take offs,

and placement plans obtained through their employment with White Cap to facilitate business for

Heyden.   White Cap has failed, however, to provide substantial evidence showing that this

information was not readily ascertainable by others or that White Cap took reasonable measures

to protect such information.   Defendants, by contrast, presented evidence tending to show that

customers and others in the public realm had ready access to this information, either for free or for

a cost depending on the circumstances, and White Cap did not take reasonable measures to protect

it as trade secret material.

An affidavit of White Cap's District Fabrication Manager Brian Davis submitted in

connection with the TRO includes information about what exactly these project-related documents

are and how they are used.   DE 19-2.   In relevant part, this affidavit states:

> The rebar sales and fabrication process generally works as described below. A
> customer contacts a supplier like White Cap and requests a quote. The supplier then
> "details" the request and creates a "takeoff," meaning a list of the components
> required to complete the request, and "placement plans," which provide
> information about how the rebar should be integrated into the structure. For single-
> family residences, detailing the project can be a straightforward process.  For larger
> or more bespoke projects like multi-story housing or commercial buildings,
> detailing can take weeks to months. A supplier may detail in-house using
> employees or contract with an external party to prepare the takeoff and placement
> plans.

*Id.* ¶ 4.   The affidavit further explains that *if* a customer purchases rebar from a supplier, there is

no charge for the detailing.  *Id.* ¶ 5.   However, *if* a customer goes with different supplier, then the

customer is usually charged for the cost of preparing detail which can range from $100 to over

$10,000 for complex projects.  *Id.*   White Cap claims it "owns" the detail until it is sold or provided

to customer at no cost.  *Id.*

Testimony from the evidentiary hearing sheds additional light on these project-related

documents and their ready accessibility by others outside of White Cap.  Rivan, who has performed

detailing work for 30 years, testified that the information that goes into a detail and shop drawing

comes from a "structural plan" that is part of "the blueprints" for a job, which "are available at any permitting office." *Id.* at 164-66.  Companies like White Cap and Heyden may obtain details from in-house or outside detailers.  *Id.* at 195.  Rivan, though his outside company Miantori, did detailing work for White Cap projects and was never told by White Cap that any document provided to him or that he produced was confidential, secret, and could not be shared.  *Id.* at 166-67.  According to Rivan, details, bar lists, take-offs, and placement plans were never called or treated as confidential or trade secret protected in any job he ever had and such project-related details "are shared with every trade during the project on the job"—including rebar, plumbing, electrical—and are also shared with customers.  *Id.* at 171-72.  Rivan denied ever taking any confidential or trade secret information from White Cap.  *Id.* at 176.

To support its contention that project-related materials such as details and placement plans are trade secrets, White Cap relies upon general company codes of conduct and confidentiality policies that its employees are trained on.  *See* White Cap Exs. 2-8 (human resource and business codes of conduct, confidentiality policy, and employee confidentiality training records).  However, these general codes and policies do not specifically encompass customer project details and there is no direct evidence to show that White Cap employees had reason to believe they were obligated to treat project information and details as confidential material.  This is especially true considering that such information apparently derives from and is shared with other non-employees and customers.  As with most similar company policies, White Cap's code of business conduct refers to confidential information as "competitively sensitive" information that is "not generally known to the public."  White Cap Ex. 2; DE 202-2 at 5.

In the absence of more specific evidence showing that the project-related material taken by some of the Defendants qualifies as publicly inaccessible trade secret material *and* that White Cap

took reasonable measures to protect such information, I cannot conclude that White Cap has shown a substantial likelihood of success on the trade secret claims.

### C.    Breach of Contract Claim Against Defendant Black

Next, White Cap claims Defendant Black breached an agreement that included restrictive covenants not to compete, use confidential information, or solicit customers for two years following his termination.  DE 14 ¶¶ 253-57; DE 14-2 (the "Black Agreement").   Black counters that White Cap lacks standing to enforce the agreement entered between Black and a predecessor company.   DE 165 at 8-9.   Upon review, I agree that White Cap has not provided sufficient evidence of its standing to enforce the non-compete and thus fails to show a substantial likelihood of success on this claim.

In Florida, non-compete contracts do not automatically vest in favor of a new business owner.   Under Florida Statute § 542.335(1)(f)(2), a court may not refuse to enforce a restrictive covenant because the party seeking enforcement is an assignee or a successor of a party to the contract, **provided that "the restrictive covenant expressly authorized enforcement by a party's assignee or successor."**  Fla. Stat. § 542.335(1)(f) (emphasis added).   Here, the Black Agreement containing the restrictive covenants that White Cap seeks to enforce was signed on November 30, 2016 and is between Black and Construction Materials, Inc. ("CMI").  DE 14-2.   It is undisputed that the Black Agreement contains no provision expressly authorizing its enforcement by any assignee or successor company.

In a single buried footnote, White Cap nevertheless states in conclusory fashion that it "has the right to enforce the Black Agreement because [predecessor company CMI] merged into White Cap."  DE 171 at 19.[8]   Apart from this conclusory footnote, White Cap did not substantively

---

[8]  Plaintiff included virtually the same footnote in its Motion for TRO.  *See* DE 19 at 18 n.5.  When Defendant Black filed a motion seeking clarification about whether the Court had considered his standing argument, DE 63, Plaintiff

respond to this standing argument in its reply or at the preliminary injunction hearing.  White Cap's single footnote merely cites to *Corp. Express Off. Prod., Inc. v. Phillips*, 847 So. 2d 406 (Fla. 2003) with no substantive explanation.[9]  Notably, this case has been superseded by statute.  *See DePuy Orthopedics, Inc. v. Waxman*, 95 So. 3d 928, 935 (Fla. 1st DCA 2012) (recognizing that *Corp. Express* analyzed the predecessor statute of Fla. Stat. § 542.33, which applied to non-competes entered before July 1, 1996 and permitted a non-compete covenant to be assigned but only if the employee consented to the assignment).

Here, White Cap has provided minimal evidence or argument to clearly establish its standing to enforce the non-compete agreement between Black and CMI.  The Black Agreement did not expressly authorize enforcement by an assignee or successor party as required by Florida statute.  There is no sign of any express assignment of the Black Agreement to White Cap as part of White Cap's arrangement with its predecessor company of CMI.  Moreover, the full scope and nature surrounding CMI's arrangement with White Cap in terms of corporate structure, ownership, asset transfers, and the like have not been provided.  The current evidence is insufficient to establish White Cap's standing to enforce Defendant Black's agreement with CMI.  Consequently, at this stage, White Cap has not shown a substantial likelihood of prevailing on this claim.

---

responded that it "addressed its standing to enforce his Agreement in its moving papers" with citation to the footnote, DE 87 at 1.  Due to a prior stay and administrative case closure, the motion for clarification was never resolved so this issue has remained an open one.  Nonetheless, despite having had ample opportunity to further expand on its arguments related to standing, Plaintiff has opted not to do so.

[9] Plaintiff's footnote also cites to three paragraphs of a "Naftel Decl."  No record cite is provided but this presumably refers to the declaration of White Cap's Chief Sales Officer Page Naftel, which was attached to White Cap's Motion for TRO.  These paragraphs indicate that CMI, an Alabama corporation, and White Cap, a Florida limited partnership, "merged with White Cap, L.P., with the surviving entity being White Cap, L.P." with reference to an attached certificate of merger.  DE 19-1 at ¶¶ 3-5.  Plaintiff is obligated to establish standing.  Plaintiff's sole reliance on a buried footnote, a case superseded by statute, and three general paragraphs in a declaration do not suffice to address the comprehensive standing argument raised by Mr. Black.

## II.    IRREPARABLE INJURY

Although White Cap has established a substantial likelihood of success on its claim of breach of fiduciary duty, White Cap has not articulated irreparable harm that will result if a preliminary injunction is not issued.  Irreparable harm is the "'*sine qua non* of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  A movant's failure to show "a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.*  A showing of irreparable injury must be "neither remote nor speculative, but actual and imminent."  *Northeastern Fla*., 896 F.2d at 1285 (quotation omitted); *see also SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 504 (11th Cir. 2007) (per curiam) (in the preliminary injunction context, irreparable injury "must be neither remote nor speculative, but actual and imminent" and "prospective harm, by itself ... does not meet the test of imminence").

Before a preliminary injunction may issue, the movant must show that irreparable harm is not merely possible, but likely.  *Alabama v. U.S. Army Corp. of Eng'rs*, 424 F.3d 1117, 1131 (11th Cir. 2005).  "An injury is irreparable only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("economic losses alone do not justify a preliminary injunction").  "The possibility that adequate compensatory ... relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  As the Supreme Court has made clear:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence

22

of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.*

For purposes of the TRO, Judge Martinez found that White Cap had shown irreparable harm based upon loss of customers and goodwill with resulting damages being "not easily quantifiable in money terms." DE 57 at 13 (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991); *Fortline, Inc. v. Moody*, 2013 U.S. Dist. LEXIS 200015, at *14 (S.D. Fla. Jan. 3, 2013)). Additionally, Judge Martinez cited a statutory presumption of irreparable harm where a party seeking enforcement of a restrictive covenant shows at least one legitimate business interest to justify the restriction. DE 57 at 13 (citing cases and Fla. Stat. § 542.335(1)(j) regarding a presumption of irreparable harm for restrictive covenant violations).

Again, however, the preliminary injunction hearing showcased key evidence running directly counter to any showing of truly irreparable injury. Below, I address White Cap's claim of presumptive irreparable harm before turning to the question of whether irreparable harm has been shown.

### A. *Presumption of Irreparable Harm*

In requesting a preliminary injunction, White Cap first argues that irreparable harm should be presumed. In White Cap's view, it "is entitled to an injunction upon establishing a violation of [Fla. Stat. § 812.035(6)] without any showing of irreparable harm." DE 171 at 20 (citing Fla. Stat. §§ 542.335(1)(j), 812.035(6)). The statutory provisions cited by White Cap create presumptions of irreparable harm for trade secret misappropriation and restrictive covenant violations under Florida law. White Cap relies principally on these statutory presumptions to justify its request for a preliminary injunction. But this reliance has been defeated considering the more expansive

evidentiary record.  As discussed in detail in the preceding section, White Cap has not established a substantial likelihood of success on its claims of trade secret misappropriation or restrictive covenant violations.  Without such showing, it naturally follows that White Cap is not entitled to a presumption of irreparable harm.

> ### B.    *Evidence of Irreparable Harm*

As set forth above, White Cap has established a substantial likelihood of success on its claim that Defendants breached fiduciary duties by soliciting White Cap customers for Heyden and using White Cap work product to facilitate business for Heyden.  Echoing the TRO, White Cap argues in its briefing that "loss of customers and goodwill is an irreparable injury."  DE 171 at 20.  White Cap further asserts that Defendants' improper solicitation of White Cap customers and taking of White Cap documents establishes irreparable harm that will continue absent a preliminary injunction.  *Id.*  I am not persuaded.

Turning first to the alleged loss of customers and goodwill, White Cap's claims in this regard are exceedingly broad and generic.  While White Cap certainly lost specific customers during Rivan, Kavney, Black, and Rosenblum's transition from White Cap to Heyden Supply in summer 2023, that loss can be accounted for and repaired monetarily by determining the overall value of those projects and calculating any financial loss associated with their ultimate completion by Heyden.  Notably, White Cap has not clearly demonstrated concrete examples of any extensive loss of customer goodwill or any *ongoing* potential for loss of future customers.

On the other hand, Defendants have presented persuasive counter-evidence establishing that many White Cap customers have longstanding relationships and remain loyal to their construction supply salespersons as opposed to the companies where they worked.  There is evidence showing that such customers continue to work with their salesperson of choice

irrespective of which company that salesperson is with.  Specifically, at the evidentiary hearing, I heard testimony from the following witnesses representing five companies who have purchased from White Cap in the past:  Idalims Sagastume of AJ Bella Contractors, Tim Mace of Brevard Grouting Service, Ricky Garrison of MGM Shell Contractors, David Toth of TNT Builders, and Michael Scammell of Scammell Constructors.  *See* Tr. I at 124-56.  Three of these five representatives confirmed their status as customers who experienced disruptive incidents with White Cap operations during the relevant timeframe, including delayed deliveries or incomplete/incorrect orders.  *Id.* at 128-29, 134-35.  These representatives also consistently testified that their companies are free to purchase from any supplier of their choosing and that they routinely form working relationships with salespeople such as Kavney and Welsh to whom they generally remain loyal irrespective of the company that employs them.  *See, e.g., id.* at 126, 134, 140, 143, 147-48.  White Cap points to no evidence to counter this testimony.  Left unrebutted, White Cap's generic claims of customer loss and goodwill do not suffice as a proper basis to find irreparable harm.

A review of a case cited in the TRO—*Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)—helps illustrate the point.  *Ferrero* involved a covenant not to compete signed by Ferrero (a building products salesman).  *Id.*  The conflict arose after Ferrero told his former employer that he intended to form a corporation to compete with them.  *Id.*  The district court granted the former employer's request for a preliminary injunction to enjoin Ferrero from competing based largely on a finding of the potential for irreparable customer loss and goodwill. *Id.* at 1449.  In the ensuing appeal, Ferrero claimed that irreparable harm had not been shown.  *Id.* In affirming issuance of the preliminary injunction, the *Ferrero* court noted that although the former employer's products were "indistinguishable" from those sold by competitors, the former

employer distinguished itself by "cultivating customer goodwill through various incentives and quality service" such as investing over $400,000 over five years for the express purpose of creating close relationships between its sales force and its customers. *Id.* at 1443.

Similarly, the later case of *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005), involved a finding of irreparable injury affirmed on appeal where the record demonstrated that plaintiff was losing approximately 3,200 customers per week and would continue to do so absent an injunction. *Id.* at 971. The nature of the goodwill and customers lost in these cases was specific and proven on the record, not speculative.

Here, by contrast, White Cap offers no similar specific evidence to establish an extensive loss of goodwill or loss of customers. *See, e.g.*, *Sylvan Learning Inc. v. Learning Sols., Inc.*, 795 F.Supp.2d 1284, 1301 (S.D. Ala. 2011) (finding no irreparable harm because the plaintiff did not present evidence showing that it had lost customers or that it had difficulty attracting new ones); *Mercedes–Benz U.S. Int'l Inc. v. Cobasys, LLC*, 605 F.Supp.2d 1189, 1207 (N.D. Ala. 2009) (denying preliminary injunction because the plaintiff merely speculated about the loss of goodwill and reputation); *Curves Int'l. Inc. v. Mosbarger*, 525 F.Supp.2d 1310, 1314 (M.D. Ala. 2007) (denying preliminary injunction where the plaintiff failed to show that loss of goodwill and customers was likely without an injunction); *H20 To Go, L.L.C. v. Martinez,* 2005 WL 2065220, at *5 (S.D. Fla. Aug. 22, 2005) (finding no irreparable harm where the plaintiff failed to articulate any precise injury or immediate threatened harm and the harm was based merely on beliefs and conclusory claims about theoretical harm); *compare BellSouth Telecomms.*, 425 F.3d at 970 (loss of goodwill and customers supported by record, which showed that the BellSouth was losing about 3,200 customers per week).

Next, regarding the alleged misuse of White Cap documents, White Cap fails to show irreparable harm stemming from this conduct. As discussed above, White Cap has set forth evidence showing that some of the Individual Defendants took White Cap documents prepared or obtained for White Cap customer projects while still employed by White Cap for anticipated use by a competitor. However, White Cap has not substantially established that these documents are protectable "trade secrets" because there is minimal evidence that White Cap took any preventative measures to preserve the confidentiality of these documents and because evidence in the record shows that these documents are available to customers or others for purchase. The evidence strongly suggests the existence of a monetary remedy for any demonstrated misuse of White Cap project-related documents, which would be adequate compensation for any cost associated with the taking of these documents.

In sum, White Cap fails to "clearly establish" the irreparable harm essential to the "drastic" and "extraordinary" remedy of preliminary injunctive relief. *See Four Seasons*, 320 F.3d at 1210. For the most part, White Cap relies on much of the same information and evidence it relied upon in moving for the TRO. Confronted with the affirmative evidence presented by Defendants, White Cap does little more than repeat the same or substantially similar broad-sweeping assertions. I acknowledge that discovery is ongoing, but one thing seems clear at this juncture. As the totality of the evidence currently stands, any harm to White Cap from Defendants' alleged misconduct has already been realized. Customers that might have been White Cap's but for Defendants' interference are already customers of Heyden or possibly another third-party supplier. An injunction would and could not change that; it would not cause these third-party customers to transition back to White Cap. To the extent that Defendants are conclusively found to have profited from improperly diverting customers or using White Cap project documents, any such

27

wrongdoing is compensable by calculable money damages.  Because the harm alleged by White Cap has for the most part already occurred and concluded, and that harm can be reduced to a monetary sum, the injury is not irreparable.  White Cap has not satisfactorily explained why an award of economic damages would not be an adequate remedy at law for its alleged injuries.  The potential loss of revenue caused by improper solicitation and any other damages caused by Defendants' alleged actions are purely economic in nature and, therefore, redressable through economic damages.  Ultimately, I find that White Cap has not met its burden of persuasion as to this prerequisite.  *SME Racks, Inc.*, 243 Fed. Appx. 502.

## RECOMMENDATION

In sum, consideration of the key critical factors counsel against entry of the extraordinary and expansive injunctive relief sought.  Notwithstanding White Cap's showing of a substantial likelihood of success on the merits on one of its claims, White Cap has not shown the requisite factor of irreparable harm warranting the extraordinary remedy of a preliminary injunction.  Without a finding of a substantial likelihood of an "actual and imminent" irreparable injury, preliminary injunctive relief is improper.   *Siegel*, 234 F.3d at 1176 ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").  Accordingly, I recommend that the Motion for Preliminary Injunction, DE 148, DE 171, be **DENIED**.

## NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District José E. Martinez.  Failure to file objections timely shall bar the parties from a de novo determination

by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016). **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 19th day of July, 2024.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE

29